[No. H028782. Sixth Dist. May 22, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ROMUNDO JOHNSON, Defendant and Appellant.

1468

## Counsel

Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and Gregg E. Zywicke, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**PREMO, J.**—On August 1, 2004, defendant Romundo Johnson fought with his girlfriend and held her by the throat until she passed out. On August 8, 2004, he punched her in the face and elsewhere about her body and stabbed her in the arm. On August 12, 2004, he ripped out the telephone because he did not want her to use it any more.

A jury found defendant guilty of one count of corporal injury to a cohabitant (Pen. Code, § 273.5, subd. (a))[1] and one count of assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)) based upon the August 1 incident; three counts of corporal injury to a cohabitant (§ 273.5) arising from the August 8 incident; and one count of disabling a telephone line (§ 591) based upon his removal of the telephone from the residence on August 12. The trial court sentenced him to 16 years four months in prison.

On appeal, defendant argues that he cannot be convicted of three violations of section 273.5 for the single assault that occurred on August 8. He also argues that allowing evidence of the out-of-court statement of a previous victim violated his right to confrontation and cross-examination under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*); there was insufficient evidence to convict him of disabling a utility line because there was no evidence his conduct was "unlawful"; and he was entitled to 280 days of presentence custody credit.

---

[1] Hereafter all unspecified statutory references are to the Penal Code.

We agree with only defendant's final contention and shall modify the judgment accordingly. As modified, we shall affirm.

## I. *Facts*

The victim, known as Jane Doe at trial, lived with defendant for about two or three months during 2004. On August 1, 2004, Doe and defendant had been drinking wine when defendant became violent and choked her so tightly she passed out and landed, facedown, on the hard kitchen floor. The fall resulted in a knot on her forehead and a bruise by her eye.

A week later, defendant became angry with Doe because he thought she had been talking to one of his friends. As Doe testified, "That's when he beat me up real bad." He punched her in the nose, eyes, and mouth. He choked her and held her by her throat against the wall. He struck her on her neck, her arm, her lower back, and her leg. He also stabbed her in the left arm. Doe could not see what it was he used to stab her; she just knew that she suffered a bleeding wound during the struggle. At trial, Doe still had a scar on her left upper arm.

The prosecution introduced photographs of Doe's injuries taken on August 12, 2004, four days after the beating. The photographs showed Doe with two black eyes, a split lip, and bruising on her neck, upper chest, and the right side of her face. There was bruising and an open wound on her arm. The back of her neck was bruised as was the part of her back over the left shoulder blade and her right hip. There was bruising on the undersides of both arms that, Doe speculated, must have occurred when defendant held her back as she tried to fight him off.

When the beating was over, Doe did not call the police because she did not want defendant to get in trouble. When, at her sister's urging, she called the police on August 12, 2004, rather than go to the police department, Doe asked the police to come to her because she was "embarrassed" to go outside.

On the morning of August 12, 2004, before Doe called the police, Doe and defendant had another argument. Defendant told her she had too many people in the house. He cut the telephone cord, pried the telephone jack out of the wall with a hammer, cut the cables on the television, and left the apartment, taking the telephone with him because, he said, he did not want her to use it.

Epifanio Sevillo, a former public safety officer with the City of Marina, testified about defendant's involvement in a prior incident of domestic violence. In August 1995, Sevillo responded to a report of a domestic disturbance. When he reached the address, he knocked and, at first, did not

hear anything. After a second knock he heard a woman screaming from inside the apartment. Defendant answered the door. There was blood on his hands and his shirt. A woman was screaming from the back of the residence. Sevillo went inside and found a woman in the bathroom, sitting on the toilet, slumped over and covering her face. She had blood on her hands and her face. When the woman removed her hands from her face, Sevillo saw that her nose was swollen and red and the bridge of her nose was purplish. The woman was "pretty emotional, distraught" and crying. Sevillo spoke to her to see if she was okay and "make sure she got some medical treatment." Sevillo asked her "what happened" and she said, "He punched me in the face, look at my nose." Sevillo then determined that the woman had been living with defendant and that he was the father of her one-year-old child. Sevillo identified photographs of the woman with a red, swollen, and bleeding nose. This, he said, was her condition when he saw her in August 1995.

The prosecution also produced another prior victim who had had a dating or habitation relationship with defendant. In November of 2002, the victim and defendant had an argument about the music being played in their residence. In his anger defendant damaged bottles in the kitchen and plants and tables in the living room. He broke the mantelpiece and he broke or threw on the floor the items that had been on the mantelpiece, the fireplace tools, and the stereo speaker. Then, in leaving, defendant pushed the victim so hard that she almost fell over the balcony railing.

Defendant did not testify. His defense was to challenge Doe's credibility and argue that she must have received her injuries when she went out to a local bar to check on her uncle.

## II. Discussion

### A. The Multiple Corporal Injury Convictions

As noted above, defendant was convicted of three counts of corporal injury upon a cohabitant (§ 273.5) arising from the August 8, 2004 incident.[2] The

---

[2] As pertinent here, section 273.5 provides: "(a) Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment.

"(b) Holding oneself out to be the husband or wife of the person with whom one is cohabiting is not necessary to constitute cohabitation as the term is used in this section.

"(c) As used in this section, 'traumatic condition' means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force."

trial court imposed sentence on all three counts but stayed the terms for two of them pursuant to section 654. Although he received punishment for only one of the three counts, defendant argues that the multiple convictions were improper because the incident was a "single continuous assault," albeit involving "multiple blows." The issue is whether defendant may receive multiple convictions for violating section 273.5 where the convictions are based upon multiple injuries inflicted during a single course of conduct. The question, initially, is one of law, subject to our independent review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

██ Section 954 generally permits multiple convictions: "An accusatory pleading may charge . . . . different statements of the same offense" and "the defendant may be convicted of any number of the offenses charged." The issue must be distinguished from the closely related question of whether a defendant may receive multiple punishment based upon a single act or course of conduct. (*People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48], disapproved on another point in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229, 1231 [45 Cal.Rptr.3d 353, 137 P.3d 184].) Section 654 prohibits multiple punishment for the same act or omission.[3] The Supreme Court has recognized the tension between section 954 and section 654. The solution adopted, in general, is "to permit multiple convictions on counts that arise from a single act or course of conduct—but to avoid multiple punishment, by staying execution of sentence on all but one of those convictions." (*People v. Ortega, supra,* 19 Cal.4th at p. 692.) Indeed, that is what the trial court did in this case.

Defendant relies upon the principle that "[a]bsent express legislative direction to the contrary, where the commission of a crime involves continuous conduct which may range over a substantial length of time and [a] defendant conducts himself in such a fashion with but a single intent and objective, that defendant can be convicted of only a single offense." (*People v. Djekich* (1991) 229 Cal.App.3d 1213, 1221 [280 Cal.Rptr. 824].) Citing *People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078] (*Harrison*), the Attorney General responds that in a case such as this one, the proper analysis involves a determination of when the charged crime is completed. We agree with the Attorney General.

---

[3] In pertinent part, section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one . . . ."

In *Harrison*, the Supreme Court rejected the contention that the defendant could not be convicted of multiple acts of digital penetration committed in the course of a 10-minute attack on the victim. The defendant had argued "that multiple digital penetrations, committed during a brief 'continuous' assault upon a struggling victim, constitute only a single violation of section 289." (*Harrison, supra*, 48 Cal.3d at p. 327.) The statute under which the defendant had been convicted proscribed "penetration, however slight, of the genital or anal openings of another person" by any foreign object if accomplished by force or fear. (Former § 289, subd. (a).) The defendant had attacked the victim in her bedroom and, in the course of the ensuing struggle, he inserted his finger in her vagina. The victim's resistance caused the defendant to remove his finger. He reinserted it twice more over the course of the attack, which lasted a total of seven to 10 minutes. (*Harrison, supra*, 48 Cal.3d at pp. 325–326.)

*Harrison*'s concern was with the conduct minimally necessary to trigger a statutory violation and thereby warrant conviction. Although there was no mention in former section 289 of what constituted a completed crime, both the rape and sodomy statutes specified: "Any sexual penetration, however slight, is sufficient to complete the crime." (§ 263; see § 286, subd. (a).) Since "section 289 has always made clear that the crime is committed simply by causing a proscribed 'penetration, *however slight*'" (*Harrison, supra*, 48 Cal.3d at p. 328), the Supreme Court concluded that "a *new and separate* violation of section 289 is 'completed' each time a *new and separate* 'penetration, however slight' occurs." (*Id.* at p. 329.) The court rejected a test employed by *People v. Hammon* (1987) 191 Cal.App.3d 1084 [236 Cal.Rptr. 822], that included consideration of whether there had been an " 'appreciable passage of time' " and a " 'reasonable opportunity for reflection.' " (*Harrison, supra*, 48 Cal.3d at pp. 332–333.) In disapproving *Hammon*, the court stressed the need to analyze "the sufficiency of the evidence in terms of the particular statutory violations at issue." (*Id.* at p. 332.) Since the defendant had made three separate penetrations of the victim's vagina, he had completed three separate violations of the statute, and three convictions were warranted. (*Id.* at p. 334.)

Defendant challenges the extension of *Harrison* to cases that do not involve sexual offenses. However, all the cases he cites either predate *Harrison* (*People v. Oppenheimer* (1909) 156 Cal. 733 [106 P. 74]; *People v. Mitchell* (1940) 40 Cal.App.2d 204 [104 P.2d 545]), are not on point (*People v. Robbins* (1989) 209 Cal.App.3d 261 [257 Cal.Rptr. 60] [pertaining to the unanimity instruction]), or involve multiple theft convictions (*People v. Packard* (1982) 131 Cal.App.3d 622, 625 [182 Cal.Rptr. 576]). As to the theft cases, this court has held that the single-intent-and-plan test applied in theft cases is not applicable to multiple burglary convictions. (*People v. Washington* (1996) 50 Cal.App.4th 568 [57 Cal.Rptr.2d 774] (*Washington*).)

In *Washington, supra,* 50 Cal.App.4th 568, the defendant was charged with two counts of burglary based upon two separate entries into a single residence. He argued that the two entries were part of a single intention, impulse, and plan to burglarize the residence and, therefore, that he could only be convicted of one burglary. (*Id.* at p. 574.) *Washington* observed that the single-intent-and-plan test had been derived from *People v. Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39], in which a defendant had been convicted of grand theft based upon the aggregation of multiple petty thefts, i.e., the illegal receipt of numerous welfare checks. In approving the trial court's instruction, the Supreme Court noted that in theft-by-false-pretense cases, as well as in larceny and embezzlement cases, the applicable test is "whether the evidence discloses one general intent or separate and distinct intents." (*Id.* at p. 519.) *Washington* recognized that this test had been consistently applied in *theft* cases. (*Washington, supra,* 50 Cal.App.4th at p. 575.) But *Washington* declined to apply the test in its multiple-entry burglary case, concluding that the difference between theft and burglary made the *Harrison* approach the more appropriate. (*Id.* at p. 577.)

*Washington* found the analysis in *People v. Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364] to be helpful. Long before *Harrison* was decided, *Neder* decided that *Bailey*'s single-intent-and-plan test was inapplicable to multiple forgery convictions. *Neder* noted that forgeries were different than theft because the essence of the proscribed conduct differed. The essence of theft is a taking and therefore when a certain amount of money is taken pursuant to one plan it is "reasonable to consider the whole plan rather than to differentiate each component part." (*Id.* at p. 852.) In contrast, the essence of forgery "is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud." (*Id.* at pp. 852–853.)

Making the analogy to *Neder, Washington* reasoned: "[T]he proscription against residential burglary is designed not so much to deter trespass and the intended crime but to prevent risk of physical harm to others that arises upon the unauthorized entry itself." (*Washington, supra,* 50 Cal.App.4th at p. 577.) "Under section 459, burglary consists of an unlawful entry with the intent to commit a felony. Thus, the crime is *complete,* i.e., one may be prosecuted and held liable for burglary, upon entry with the requisite intent. [Citation.] It follows, therefore, that every entry with the requisite intent supports a separate conviction." (*Id.* at pp. 578–579.)

The *Washington* analysis is equally applicable to the crime described by section 273.5. Any person who "willfully inflicts" corporal injury upon a spouse or cohabitant is guilty of violating section 273.5. The section is violated only if corporal injury results from the "direct application of force on the victim by the defendant." (*People v. Jackson* (2000) 77 Cal.App.4th 574, 580 [91 Cal.Rptr.2d 805].) The statute proscribes a "very particularized battery." (*Id.* at p. 578.) The essence of any battery is the touching of the victim. (*Ibid.*) In section 273.5, the touching must result in bodily injury. Thus, evidence of one punch to the face resulting in a black eye would constitute a completed violation of section 273.5. We conclude, therefore, that the crime described by section 273.5 is complete upon the willful and direct application of physical force upon the victim, resulting in a wound or injury. It follows that where multiple applications of physical force result in separate injuries, the perpetrator has completed multiple violations of section 273.5.

Turning to the evidence, we review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find defendant guilty beyond a reasonable doubt of the three crimes he challenges here. (*People v. Williams* (1997) 16 Cal.4th 635, 678 [66 Cal.Rptr.2d 573, 941 P.2d 752].)

Defendant indisputably committed successive acts of violence against Doe. Although Doe's testimony does not precisely describe the sequence of the beating, we do know that defendant beat her about the face and head; held her by her throat up against the wall; beat her on her back, hips, and legs; and stabbed her in the upper arm. Doe suffered two black eyes, a split lip, bruises to her neck, back, and hips and a puncture wound to her upper arm. From this evidence the jury could have concluded that defendant completed one violation of section 273.5 when he beat Doe about the head and face, blackening her eyes and splitting her lip; another when he held her by the throat and continued to strike her and restrain her such that she suffered bruises about her back and neck; and another when he injured her upper arm, drawing blood and leaving a visible scar. Accordingly, the evidence is sufficient to support the three convictions of section 273.5.

### B. *Hearsay Statement of Prior Victim*

Defendant claims that the trial court erred in permitting evidence of the prior victim's 1995 statement to Sevillo, "He punched me in the face, look at my nose." Since that victim did not testify, defendant claims that introduction of the statement deprived him of his Sixth Amendment right to confront and cross-examine the witnesses against him. (*Crawford, supra,* 541 U.S. 36.) We

independently review determinations affecting a defendant's constitutional rights. (Cf. *People v. Seijas* (2005) 36 Cal.4th 291, 304 [30 Cal.Rptr.3d 493, 114 P.3d 742].)

▮ The confrontation clause of the United States Constitution, Sixth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford* held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. at pp. 53–54.) Only " 'testimonial' statements" cause the declarant to be a "witness" within the meaning of the confrontation clause. (*Id.* at p. 51.) Among the types of statements that *Crawford* identified as falling within a core class of " 'testimonial' " statements were those "taken by police officers in the course of interrogations." (*Id.* at p. 52.) *Crawford* did not otherwise define the phrase. In this case, the trial court held that the prior victim's statement was not testimonial and was admissible as an excited utterance. (Evid. Code, § 1240.)

Further clarification concerning the meaning of "testimonial" came in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), after trial of this case was completed.[4] *Davis* explored the distinction between testimonial and nontestimonial statements in the context of reports by victims of domestic violence. *Davis* consolidated two separate domestic violence criminal convictions, *Davis v. Washington* and *Hammon v. Indiana.* In *Davis v. Washington*, the victim telephoned 911 but hung up. The 911 operator reversed the call, and when the victim answered, the operator asked, " 'What's going on?' " The victim responded, " 'He's here jumpin' on me again.' " (*Davis, supra,* 547 U.S. at p. 817 [165 L.Ed.2d at p. 234, 126 S.Ct. at p. 2270].) The operator obtained the defendant's name and determined that there were no weapons, he was " 'usin' his fists.' " (*Id.* at p. 817 [165 L.Ed.2d at p. 234, 126 S.Ct. at p. 2271].) In *Hammon v. Indiana*, police responded to a report of a domestic disturbance. They found the victim alone on the front porch. Although she appeared somewhat frightened, she told them that everything was fine. When the police entered the house they found broken glass on the floor in front of a gas heating unit. The defendant was present and told the police that he and his wife had had an argument but that everything was fine now. The officers separated the defendant from the victim while one officer questioned the victim. They insisted that the defendant remain in a separate room " 'so that [they could] investigate what had happened.' " (*Id.* at p. 820 [165 L.Ed.2d at p. 235, 126 S.Ct. at p. 2272].) After hearing the victim's account, the officers had her sign a " 'battery

---

[4] *Davis* was decided after the parties filed their briefs in this case. We have since received supplemental letter briefs from both parties pertaining to the application of *Davis* to this case.

affidavit.' " In her affidavit, the victim stated that the defendant had broken the furnace and " 'shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter.' " (*Ibid.*)

The United States Supreme Court determined that the 911 report was not "testimonial" and, therefore, the tape recording of the call could be heard by the jury even though the caller was not called as a witness at trial. (*Davis, supra,* 547 U.S. at p. 827 [165 L.Ed.2d at p. 240, 126 S.Ct. at p. 2277].) But the victim's statements to an interrogating officer in *Hammon v. Indiana* were testimonial. (*Id.* at pp. 829–830 [165 L.Ed.2d at p. 242, 126 S.Ct. at p. 2278].) In distinguishing between the two cases, the court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822 [165 L.Ed.2d at p. 237, 126 S.Ct. at pp. 2273–2274].)

Defendant argues that by the time Sevillo arrived at the scene of the disturbance in 1995, there was no ongoing emergency. Defendant had been separated from the victim and the victim was in the protective presence of a police officer. Sevillo's question to her, "What happened?" shows that he was soliciting information about past events.

The Attorney General argues that the circumstances objectively indicated an ongoing emergency and that the primary purpose of the interview was to assess the present situation and determine if the woman needed medical help.

The facts surrounding the prior victim's statement to Sevillo do straddle the line between the two cases decided in *Davis.* We decide the issue by applying the test set forth by the court: Did the circumstances *objectively* indicate that there was an ongoing emergency when the victim made the statement to Sevillo? We think they do. Sevillo heard the woman screaming as he stood at the door; the man who answered the door had blood on his hands; and the woman in the bathroom had a bloody, broken nose. That is the only information the officer had when he asked "What happened?" Indeed, although he might have suspected domestic violence, Sevillo did not know at that point whether or not a crime had been committed. The officer interrupted an ongoing emergency and obtained information from the victim in order to assess the situation. Thus, her statement to him was not testimonial.

Even if introduction of the prior victim's statement was error, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Sevillo testified as to his observations and identified the condition of the victim in the photographs introduced into evidence. The second prior victim testified about defendant's violent temper. And Jane Doe gave her account of the beatings she suffered, corroborated by the photographs taken of her four days after the second beating. In light of this overwhelming evidence, any error in admitting the prior victim's statement was harmless beyond a reasonable doubt.

### C. *The Conviction for Disabling a Utility Line*

█ The jury found defendant guilty of violating section 591. Section 591 provides, in pertinent part: "A person who unlawfully and maliciously takes down, removes, injures, or obstructs any line of telegraph, [or] telephone . . . or severs any wire thereof . . . is punishable by imprisonment in the state prison, or by a fine not exceeding five hundred dollars ($500), or by imprisonment in the county jail not exceeding one year." To be guilty of violating section 591, it is enough to simply tamper with a telephone in such a way as to preclude its use for receiving or placing calls. (*People v. Kreiling* (1968) 259 Cal.App.2d 699, 704 [66 Cal.Rptr. 582] (*Kreiling*).) The telephone or telephone equipment need not belong to the telecommunications provider. Disabling a privately owned telephone can violate section 591. (*People v. Tafoya* (2001) 92 Cal.App.4th 220, 227 [111 Cal.Rptr.2d 681].) Indeed, one may violate the statute by disabling one's own telephone so long as one acts " 'unlawfully and maliciously' " in doing so. (*People v. McElroy* (2005) 126 Cal.App.4th 874, 883 [24 Cal.Rptr.3d 439].)

Defendant argues that there is insufficient evidence to support his conviction under section 591 because there is no evidence that his removal of the telephone and telephone jack was "unlawful." Defendant does not dispute the jury's implied finding that he acted with malice in removing his telephone and wall jack. Defendant argues that the jury was bound to find, in addition, that removing the telephone was unlawful for some reason independent of section 591, as in *People v. McElroy, supra,* 126 Cal.App.4th at page 884, where the defendant committed the crime of dissuading a witness when he removed the telephone to prevent the victim from calling the police. Since there was no evidence that defendant removed the telephone to prevent Doe from calling the police, and his conduct was not unlawful under any other law, defendant argues that the evidence is insufficient to support his conviction on this count. The Attorney General responds that the Legislature's use of the word "unlawfully" does not add a separate element to the crime.

■ We must decide whether, by including the word "unlawfully" in the description of the crime, the Legislature intended to incorporate an independent element of unlawfulness. The question is one of statutory interpretation, a core judicial function to which we apply an independent standard of review. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 470 [20 Cal.Rptr.3d 428, 99 P.3d 1015].) Our review is guided by settled principles. Generally, the provisions of a penal statute "are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (§ 4.) When statutory language is clear and unambiguous, there is no need for construction. The plain language of the statute controls. (See *People v. Boyd* (1979) 24 Cal.3d 285, 294 [155 Cal.Rptr. 367, 594 P.2d 484].) Where the statute is susceptible of two reasonable constructions, a defendant is ordinarily entitled to that construction most favorable to him. (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 488 [134 Cal.Rptr. 630, 556 P.2d 1081].) But "[i]t is well established that a specific provision should be construed with reference to the entire statutory system of which it is a part, in such a way that the various elements of the overall scheme are harmonized." (*Id.* at p. 489.)

The plain language of section 591 is that one may be guilty of the crime if he or she acts "unlawfully and maliciously." Without more, one might presume that the phrase imposes two separate elements to be proved. But in many circumstances, "unlawful" and "malicious" are interrelated concepts. Some statutes that define a crime as the "unlawful" doing of a particular act have been interpreted as not requiring separate proof of unlawfulness. The specification of unlawfulness is, in effect, a negative averment. (See *People v. Osaki* (1930) 209 Cal. 169, 177–178 [286 P. 1025].) The act, performed with the requisite mental state, is unlawful unless the defendant can prove an excuse or justification. Murder is one example. Murder is defined as the "unlawful killing" of a person "with malice aforethought." (§ 187, subd. (a).) The act of killing a person with malice aforethought is, by itself, unlawful. As *People v. Frye* (1992) 7 Cal.App.4th 1148, 1159 [10 Cal.Rptr.2d 217], explained: "[T]he concept of unlawfulness in a homicide case simply signifies the absence of excuse or justification."[5] The existence of justification or excuse negates the element of malice, thereby negating the unlawfulness of

---

[5] Indeed, the word "unlawful" is defined by Black's Law Dictionary as "equivalent to 'without excuse or justification.'" (Black's Law Dict. (6th ed. 1990) p. 1536.) The complete definition is: "That which is contrary to, prohibited, or unauthorized by law. That which is not lawful. The acting contrary to, or in defiance of the law; disobeying or disregarding the law. Term is equivalent to 'without excuse or justification.' State v. Noble, 90 N.M. 360 [563 P.2d 1153, 1157]. While necessarily not implying the element of criminality, it is broad enough to include it." (*Ibid.*)

the killing. (*Frye, supra*, 7 Cal.App.4th at p. 1155.) Thus, as *Frye* explained, "in connection with the use of violence against another person in a homicide case, the word 'unlawful' is a term of art. It connotes a homicide with the absence of factors of excuse or justification." (*Ibid.*)

Defendant argues that since this is not a homicide case, the *Frye* analysis does not apply. But other crimes defined as the "unlawful" performance of a prohibited act have been construed the same way. For example, section 242 defines battery as "any willful and unlawful use of force or violence upon the person of another." Like murder, battery does not require proof of unlawfulness separate from the use of force; lawfulness (justification) is an affirmative defense. (*People v. Mayes* (1968) 262 Cal.App.2d 195, 198 [68 Cal.Rptr. 476]; CALJIC No. 16.140.) Mayhem is defined as "unlawfully and maliciously" dismembering or disfiguring a person's body. (§ 203.) The act is unlawful unless the defendant can produce evidence of a justification or excuse that would negate the element of malice. (*People v. Bryan* (1961) 190 Cal.App.2d 781, 787 [12 Cal.Rptr. 361].)

Many of the statutes defining a crime as the "unlawful" commission of an act have not been judicially construed in a published opinion. For example, section 218 provides: "Every person who unlawfully . . . places any obstruction on any railroad with the intention of derailing" a railroad train is guilty of train wrecking. It is a felony for any person to "unlawfully" alter any light or signal "with intent to bring any vessel into danger." (§ 610.) And section 415 prescribes punishment for a person who "unlawfully fights" in a public place. If we apply defendant's construction to these examples, evidence of the proscribed acts—placing objects on the railroad tracks, tampering with navigational signals, fighting in public—combined with the requisite criminal intent, would not be sufficient for a conviction absent a finding that the conduct was unlawful under some other law. We doubt that is what the Legislature intended. Indeed, when the Legislature intended to require the prohibited conduct to be separately unlawful, it has written that into the statute. (See, e.g., § 191.5, subd. (a) [describing gross vehicular manslaughter while intoxicated as "the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code."].)

■ We have considered the foregoing statutes, among others, because we are bound to interpret a statute to harmonize with the entire statutory system of which it is a part. (*Bowland v. Municipal Court, supra*, 18 Cal.3d at p. 488.) In our review, we have found no statute defining a crime as the "unlawful" commission of an act that, without more, has been construed to mean that the act must be independently unlawful. Defendant has not cited

any such judicial construction. Furthermore, it has been said, "there is no canon against using common sense in construing laws as saying what they obviously mean." (*Roschen v. Ward* (1929) 279 U.S. 337, 339 [73 L.Ed. 722, 49 S.Ct. 336].) " 'We avoid interpretations and constructions which defy common sense or which might lead to mischief or absurdity, including literal meanings which would lead to a result not intended by the Legislature.' " (*Peters v. Superior Court* (2000) 79 Cal.App.4th 845, 849 [94 Cal.Rptr.2d 350], quoting *Board of Retirement v. Santa Barbara County Grand Jury* (1997) 58 Cal.App.4th 1185, 1189 [68 Cal.Rptr.2d 607].) We conclude that, by using the word "unlawfully" in section 591, the Legislature did not intend that the proscribed conduct be unlawful independent of the prohibition contained in section 591. Proof that a person did the act with malice is proof that the act was unlawful.

Our conclusion is supported by reference to a companion statute, section 591.5, which provides that a person who "unlawfully and maliciously" obstructs the use of any wireless communication device "with the intent to prevent the use of the device to summon assistance or notify law enforcement or any public safety agency of a crime" is guilty of a crime. This section was obviously intended to criminalize the obstruction of wireless communications to prevent the reporting of a crime. The word "unlawfully" in this code section surely does not mean that the prohibited act must also be unlawful in some way other than as specified in the statute.

*People v. McElroy, supra,* 126 Cal.App.4th 874, is not to the contrary. In *McElroy,* the defendant battered his girlfriend. When the girlfriend attempted to call the police, defendant unplugged the main telephone and placed it on a chair outside the door where she could not get to it. By unplugging the main telephone, the cordless telephones in the residence were also disabled. (*Id.* at p. 878.) The defendant argued on appeal that the evidence was insufficient to support his conviction for disabling the telephone because there was no evidence that he had "unlawfully" done so. The appellate court rejected the argument, finding that the defendant's conduct in that case was separately unlawful as a violation of section 136.1, subdivision (b)(1) (dissuading a witness). (*People v. McElroy, supra,* 126 Cal.App.4th at p. 876.) Given the state of the evidence, the court was not required to decide whether unlawfulness was a separate element of the crime.

Our interpretation of section 591 is implied in the appellate court's discussion in *Kreiling, supra,* 259 Cal.App.2d 699. In that case, the defendant was accused of disabling a pay telephone located in a local tavern. The defendant was a former telephone company employee who had opened the telephone mechanism and tripped the relay in order to make a long distance call without paying for it. The maneuver rendered the phone unusable

thereafter. The defendant's mischief was uncovered when telephone company employees came to the tavern to fix the telephone. The defendant was present and explained to the repairmen what he had done to the telephone. The repairmen observed that the defendant appeared to be intoxicated at the time. (*Id.* at p. 701.) *Kreiling* concluded that the evidence was sufficient to support the jury's implied finding of malice: "In this case there was evidence from which the jury could properly have concluded that the appellant deliberately tripped the relay fork, knowing full well that the result would be to put the telephone out of service. That he may also have harbored an intent to defraud the telephone company does not prevent a finding of malice, but rather supports the inference that his conduct was designed intentionally to injure the telephone company. The jury was not obliged to believe that his conduct was activated solely by euphoria induced by his consumption of alcoholic beverages." (*Id.* at p. 705.) In other words, evidence of the defendant's knowledge that his conduct would render a public telephone unusable supported the element of malice. Evidence that he may also have intended to defraud the telephone company was *additional* evidence of malice. His defense, intoxication, would, if believed, have negated the element of malice, i.e., his conduct would not have been unlawful under section 591.

We now turn to the evidence. Defendant does not dispute that the evidence was sufficient to support the jury's implied finding of malice. Nor does defendant argue that his conduct in removing the telephone and jack was lawful beyond the fact that the conduct did not violate a law other than section 591. That is to say, there was no evidence of excuse or justification. Accordingly, the evidence was sufficient to support defendant's conviction of section 591.

Defendant also argues that the trial court should have defined the term "unlawful" for the jury. No such instruction was warranted. We have concluded that the statute does not require a finding that the conduct was independently unlawful. And since there was no evidence of excuse or justification for the conduct, the concept of unlawfulness as it is used in section 591 was superfluous and there was no reason to instruct the jury on the point or to define the term. (See *People v. Frye, supra,* 7 Cal.App.4th at p. 1159.)

## D. *Custody Credits*

Defendant had been taken into custody on August 12, 2004. He was sentenced in this case on April 12, 2005. Thus, defendant spent a total of 244

days in custody prior to sentencing. The trial court, however, did not award any credit for his time in custody. Defendant argues this was error and asks this court to correct the oversight and award 244 days for actual time served and 36 days of conduct credit.[6]

The Attorney General first argues that since defendant did not raise the issue below, he has waived it, but as defendant correctly points out, *People v. Aguirre* (1997) 56 Cal.App.4th 1135, 1139 [66 Cal.Rptr.2d 77], held that failure to object at trial does not waive the issue of custody credits on appeal since the issue does not involve a discretionary sentencing choice but is a purely mathematical calculation.

The Attorney General argues, in the alternative, that defendant was not entitled to presence credit because his presence custody is attributable to a violation of probation. Defendant was on probation at the time he was arrested in this case. He was found in violation of probation on August 14, 2004, his probation was terminated, and he was sentenced to 365 days in jail on October 19, 2004. The probation report indicates that probation was violated based upon case No. MS042234A, i.e., this case.

Section 2900.5, subdivision (b) provides, in relevant part, that "credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." A defendant is not entitled to credit for presence confinement unless he shows that the conduct which led to his conviction was the sole reason for his loss of liberty during the presence period. A criminal sentence may not be credited with jail or prison time attributable to a parole or probation revocation that was based only in part upon the same criminal episode. (*People v. Bruner* (1995) 9 Cal.4th 1178, 1191 [40 Cal.Rptr.2d 534, 892 P.2d 1277].) A defendant must prove that the conduct which led to the conviction was a "dispositive" or " 'but for' " cause of the presence custody. (*Id.* at p. 1180.)

The record demonstrates that defendant was found in violation of probation based only upon the crimes for which he was convicted in this case. Accordingly, the conduct that led to his conviction in this case was the "but for" cause of his presence custody. It follows that defendant is entitled to the 280 days of credit.

---

[6] Defendant recognizes that under sections 2933.1 and 667.5, subdivision (c)(8), he is entitled to conduct credit of only 15 percent of the time he actually spent in custody.

### III. Disposition

The trial court is directed to modify the judgment and award defendant 280 days of custody credit and to prepare an amended abstract of judgment in accordance with this disposition and to deliver it to the Department of Corrections. As modified, the judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied June 18, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 25, 2007, S154697. Werdegar, J., and Moreno, J., were of the opinion that the petition should be granted.