Filed 9/3/13  P. v. Anderson CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID DWAYNE ANDERSON,<br><br>    Defendant and Appellant. | B242392<br><br>(Los Angeles County<br>Super. Ct. No. TA118786) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kelvin D. Filer, Judge.  Affirmed as modified.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant David Dwayne Anderson of mayhem in violation of Penal Code section 203[1] in count 1, assault with a deadly weapon in violation of section 245, subdivision (a)(1) in count 2, and assault by means likely to produce great bodily injury in violation of section 245, subdivision (a)(1) in count 3. The jury found in counts 2 and 3 that defendant personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a). The jury also found that defendant personally used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1) in count 1.[2]

The trial court sentenced defendant to the high term of eight years in count 1 and struck the enhancement for personal use of a deadly weapon in that count. The trial court imposed the midterm of three years in counts 2 and 3 and three years for the great bodily injury enhancements for a total of six years in each of those counts. The court ordered the sentences for counts 2 and 3 to be stayed under section 654.

Defendant appeals on the grounds that: (1) the trial court prejudicially erred when it failed to instruct the jury on the lesser included offense of battery causing serious bodily injury (§ 243, subd. (b)) as a lesser included offense to mayhem in count 1; and (2) defendant's conviction in count 3 must be vacated because it is duplicative of his conviction in count 2.

## FACTS

**Prosecution Evidence**

On April 12, 2011, Ferraria Radley went to the Game Sports Bar to celebrate her birthday with her aunt and her sisters, Cora and Jennifer. A club promoter whom

---

[1]    All further references to statutes are to the Penal Code unless stated otherwise.

[2]    Defendant was tried along with a codefendant, Uniqua Adams, who was convicted only of simple battery in violation of section 242, subdivision (a) as a lesser included offense of the aggravated assault charge in count 3.

Ferraria[3] knew invited her and her party to enter the VIP room at the club.  There, he introduced Ferraria to defendant and Uniqua Adams, who was with defendant.  Defendant was holding a bottle of Moet champagne from which he was drinking, and he had purchased other bottles of champagne that he was sharing with the other people in the room.  Defendant was much more talkative than Adams and spoke to everyone in the room.  Ferraria drank approximately three glasses of champagne in the two hours she was at the club.

Defendant brought up the subject of continuing on to the Starz club.  Ferraria's sisters did not want to go.  Ferraria decided to go the Starz club with defendant and Adams.  The three left the Game Sports Bar at approximately 1:45 a.m. in defendant's Escalade.  Adams drove, defendant sat in the front passenger seat, and Ferraria sat in the rear on the passenger side.  Defendant had two bottles of champagne in the vehicle, one of which was a green Moet bottle.  Ferraria and defendant passed the bottle between themselves and continued to drink from the green bottle.

When the threesome arrived at Starz, a security guard told them the bar was closed.  They drove away, and Adams remarked that she needed to stop for gas.  Ferraria testified that they had no further plans at that point.  Ferraria told the couple that she wanted to be taken home because she had to take her daughter to school in the morning.  As they were leaving the gas station, Ferraria noticed two men standing near their car at a gas pump.  Defendant looked back at Ferraria and asked, "Are you looking at other niggers while you in my truck?"  Ferraria was stunned and surprised by the remark because she had made no advances toward defendant during the evening.  She believed that he and Adams were together "in some way" because they had told Ferraria about the places they had been together and because Adams was driving defendant's vehicle.

Ferraria responded to defendant by saying, "We're not in a relationship."  Defendant became more upset and repeated, "Are you looking at niggers while you're in

---

[3]     To avoid confusion, we refer to the victim and other members of her family by their first names.

3

my truck?" Ferraria replied, "You're not married to me. You're not with me. How can you ask me that when you're up there with [Adams]?" Ferraria and defendant began arguing. Adams joined in and yelled at Ferraria, "Don't talk to him like that." They were on the freeway at that point, and Ferraria asked to be dropped off at the next exit.

Adams took the Vermont Avenue exit from the freeway, made a right turn, and stopped the car. Ferraria immediately got out of the car and began walking toward the curb. She intended to walk to a nearby gas station to call a taxi. Defendant got out of the car as well, and Ferraria heard him say, "Beat that bitch ass, beat her ass." Ferraria felt physically threatened. Adams got out of the car, and Ferraria turned to face her. Ferraria dropped her clutch bag and Adams "hopped right on [her]" and grabbed her. Ferraria grabbed Adams, too, and the two women wrestled each other to the ground. As they wrestled, Ferraria was able to climb on top of Adams. Ferraria said to her, "Look, I don't know you. I don't want to fight you. All I want to do is go home. Let me go and I'll let you go." Adams responded, "Okay. Let me go."

When Ferraria let Adams go, Adams pushed her onto her back and climbed on top of her. Ferraria pushed Adams on her back again and said, "Look, I thought I said I don't want to fight you. Why are you letting him make you fight me?" Ferraria began to feel blows to her back, close to her neck. She believed defendant had joined in the attack. She began to move to her right and was then "struck in the face really hard." The blow was so painful that it knocked all emotion from her, and she was unable to react. Ferraria had no idea what had hit her and thought only of getting away. Ferraria could feel blood shooting from her face and could neither see nor hear. She got to her feet and stumbled backwards. She picked up her clutch from the ground and began walking away. She did not even look back to see if the two were coming after her.

Ferraria thought she should telephone her mother, and her mother would know what to do. She called her mother on her cell phone and began screaming, "'Mom, he hit me so hard, please come get me.'" She told her mother she was at Imperial Highway and Vermont Avenue and begged her to come and get her. Ferraria then began to walk.

4

Ferraria's father, Eric, her sister, Jennifer, and her mother got in the car and drove to Vermont Avenue. When Eric finally found his daughter he saw she was "a complete bloody mess." Her entire face was covered in blood and she had black eyes. She said she was in a lot of pain. Her father began to drive her to UCLA hospital in Westwood. Jennifer asked Ferraria if the person who attacked her was "the guy from the bar," and Ferraria confirmed that it was.

Officer Phillip Sudario and his partner, Officer Padilla, of the Los Angeles Police Department (LAPD), responded to the hospital where Ferraria was taken. Officer Sudario saw that Ferraria was "badly beaten." She was in and out of consciousness and somewhat incoherent. Ferraria told the officers that she pleaded with defendant and Adams to let her out of the car and that Adams had punched and slapped her. Defendant told Adams to "kick her butt." Adams then punched and kicked her, and defendant came up and also battered her. In an interview in May 2011, Ferraria told Detective Kelly Sullivan that she believed defendant kicked her.

A few days after the incident, Detective Marcella Fathauer and Detective Tyson met with Ferraria at the hospital. Her face was very swollen and had stitches. The detectives showed Ferraria two six-pack photographic lineups from which Ferraria was able to identify defendant as her attacker and Adams as the one who helped defendant.

Ferraria stayed at that hospital for four days while personnel treated her pain and she underwent various tests. She was given stitches in her nose and eye. She could not see out of her right eye. She needed surgery for her facial fractures but was obliged to undergo surgery at Harbor UCLA hospital at a later date because she had no health insurance.

Approximately nine days after the attack, Ferraria was returning from a doctor's appointment with her parents and Jennifer when they decided to try to locate the spot where the attack had occurred. When they arrived at the scene, Ferraria saw marks indicating where it appeared she had bled. Jennifer said to Eric, "Dad, that's a Moet champagne bottle right there." There were broken shards all over the area. Ferraria recognized the bottle from the shards.

5

At that point, Eric remembered the doctors' opinions on how Ferraria had been injured and believed that Ferraria could have been struck by the bottle they found. Jennifer called the police. Detective Fathauer arrived and directed other officers to take photographs and retrieve some evidence. Ferraria told Detective Fathauer that she believed she had been struck by a champagne bottle.

The remnants of the champagne bottle were inadvertently destroyed by the LAPD before trial. Detective Sullivan saw the shards before they were destroyed and noted that the label on the neck of the bottle identified it as a Moet bottle. His visual examination of the bottle did not reveal blood.

On April 27, 2011, Dr. Eric Crum operated on Ferraria's eye. Ferraria required a second surgery on her nose in September. Despite the eye operation, she was rendered legally blind due to the attack.

Dr. David Isaacs, a clinical instructor at UCLA, testified as an expert witness for the prosecution. He had seen Ferraria at UCLA hospital in Westwood at the time of the attack, and he had re-examined her a few weeks before trial. He reviewed Ferraria's medical records from both hospitals. Ferraria's CT scan revealed fractures to her nasal bone, the medial wall of her eye orbit, the orbital floor, the lateral orbital wall, and the zygomatic arch. Dr. Isaacs counted at least five separate fracture sites and noted a laceration on Ferraria's nasal bridge. Dr. Isaacs observed that Ferraria was suffering from proptosis, which occurs when the eye protrudes from its baseline state. Proptosis may be caused by blunt force. Dr. Isaacs's most recent tests on Ferraria's eye showed that it was unlikely to get better. The affected part of her eye causes blurring of her central vision. He noted that Ferraria is legally blind in her right eye. He believed her injuries were consistent with blunt-force trauma, such as being hit with a champagne bottle.

**Defense Evidence**

Defendant testified that he and Adams made reservations for the VIP room of the Game Sports Bar on the day of the incident. He saw Ferraria there and at some point poured her champagne from the bottles he had purchased. It was Ferraria's idea to leave

6

with defendant and Adams, and it was her suggestion to go to Starz. Ferraria said she used to dance at Starz, which is a gentleman's club. Ferraria wanted to have a few more drinks and see some of her friends who worked there. Adams drove the Escalade because defendant had been drinking. Starz was closed, and they next went to a gas station.

Defendant denied that he became angry with Ferraria because she looked at some other men at the gas station. Ferraria said she wanted to find somewhere to have drinks, and Adams said it was getting late. She asked Ferraria where she lived in order to take her home. Ferraria was not ready to go home and wanted to keep partying. Adams and Ferraria began to argue about whether or not to take her home. Ferraria made derogatory remarks about Adams, and Adams was insulted. At one point, Ferraria tapped Adams on the back of the head. Adams became angry and told Ferraria that they were dropping her off. Adams exited the freeway at Vermont Avenue, immediately pulling over on the street.

Defendant believed he should drive from that point on because Adams was so upset. He and Adams got out of the Cadillac to exchange places. They crossed paths in front of the car, and as defendant reached the driver's side door, he turned and saw Adams and Ferraria fighting. He went back around the front of the Cadillac and saw that Ferraria was on top of Adams. Ferraria was holding a bottle of champagne over her head "in a striking motion." Ferraria "struck the bottle trying to hit Ms. Adams" and defendant ran over to the two women, who were then struggling over the bottle.[4] He shoved Ferraria off Adams and she flew forward. He wanted to prevent her from trying to strike again. Defendant then picked up Adams and asked her if she was okay. They walked back to the car and defendant drove home after determining that Adams was not injured.

Later that morning, defendant and Adams went to the local sheriff's station and spoke with a deputy at the front desk. They were told to contact the LAPD. They left

---

**4**     Defendant testified on cross-examination that Adams and Ferraria were standing up when they were struggling over the bottle.

7

their telephone number and names, and a Detective Tyson telephoned them. They were not contacted by Detective Williams.

**Rebuttal Evidence**

Detective Williams of the LAPD received a telephone call from Adams at noon on April 13, 2011—just a few hours after the incident. He spoke with defendant during the same call. Defendant wanted to know why the police were looking for him. Detective Williams replied, "'I don't know. Why do you think they're looking for you?'" Defendant replied that his girlfriend and another girl had been involved in a fight, and the police were showing photographs of him to some individuals. Defendant further explained that he and his girlfriend met a young lady in the VIP section of the Game Sports Bar, and after a couple of hours he asked this young lady if she wanted to leave and go to another club called Starz. When they got to Starz it was about to close and he asked her if she wanted to go to their house, and she agreed. When the detective asked why she was going to defendant's house, defendant laughed and said, "'to party, the three of us.'" On the way to his house the woman said she had to get up and leave by 5:30 a.m. because her daughter had to go to school. They told her they were not going to get up that early. The two women then began arguing. Defendant's girlfriend pulled over and told the woman she had to "'get the fuck out.'" Defendant's girlfriend got out, opened the car door, and began to pull the other woman out of the car. The two women began to fight outside the car. After the fight, the woman ran down the street. He and his girlfriend got back in their car and drove away. Defendant said nothing about a champagne bottle being used as a weapon or about pressing charges.

About an hour after defendant's call, Detective Williams received a call from a man who was unhappy with the way the police were handling his daughter's investigation. Detective Williams "put those two together" and realized the calls were associated. He then filed a report about defendant's telephone call because he realized it was a criminal investigation and he was a potential witness.

## DISCUSSION

## I. Lack of Lesser Included Offense Instruction

### A. Defendant's Argument

Defendant contends that the trial court had a sua sponte obligation to instruct the jury on the offense of battery causing serious bodily injury (§ 243, subd. (d)) as a lesser included offense to mayhem because there was some question as to whether Ferraria's eye was injured to the extent that it was useless for the ordinary and practical purposes of life within the meaning of section 203.

### B. Relevant Authority

Section 203 provides: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

A lesser included offense instruction is required: "[W]hen the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154; accord, *People v. Valdez* (2004) 32 Cal.4th 73, 115.) Our Supreme Court has explained: "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162; accord, *People v. Thomas* (2012) 53 Cal.4th 771, 813.)

We review the failure to instruct on a necessarily included lesser offense under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 165.) We must determine whether an examination of the entire record

9

establishes that there is a reasonable probability the claimed error affected the outcome. (*Ibid.*)

### C. Proceedings Below

The jury was instructed with CALCRIM No. 801 that, in order for the jury to find defendant guilty of mayhem, the People had to prove that the defendant caused serious bodily injury when he unlawfully and maliciously disabled or made useless a part of someone's body and the disability was more than slight or temporary, or that he permanently disfigured someone, or that he slit someone's nose, ear, or lip, or that he put out someone's eye or injured someone's eye in a way that so significantly reduced her ability to see that the eye was useless for the purpose of ordinary sight. The instruction further provided that a serious bodily injury may include, but is not limited to, a protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. The instruction stated that a disfiguring injury may be permanent even if the injury can be repaired by medical procedures.

### D. No Error

Defendant argues that the testimony of both Ferraria and Dr. Isaacs indicated that, although there was a blind spot in the center focus of Ferraria's vision, she retained residual vision in the periphery of her eye by means of which she could discern objects. He maintains that a reasonable juror could have concluded that, despite Ferraria's eye injury, the injury element of mayhem was not proved beyond a reasonable doubt. Ferraria still had sufficient vision to discern objects and thus was able to use her eye in the ordinary and usual practical purposes of life. There was no evidence that the limited vision in her right eye substantially diminished her ability to see when she used both of her eyes, as is the normal practice. Therefore, her eye was not "useless" as provided for in the instruction, which states that the eye must be "useless for the purpose of ordinary sight." (See CALCRIM No. 801.) Defendant emphasizes that he does not challenge the permanence of Ferraria's injury.

10

Mayhem occurs "when the inflicted injury not only completely destroys the victim's eyesight [citation], but also when it causes impairment less than total blindness." (*People v. Dennis* (1985) 169 Cal.App.3d 1135, 1138; see also *People v. Nunes* (1920) 47 Cal.App. 346, 350 ["What the statute obviously means by the expression or phrase, 'put out the eye,' is that the eye has been injured to such an extent that its possessor cannot use it for the ordinary and usual practical purposes of life."].)  In *People v. Dennis*, the victim's left lens was dislocated and had to be removed.  As a result, the victim lost the ability to focus.  She achieved a visual acuity of 20/50 in the eye with eyeglasses, but the glasses blurred the vision in her other eye.  (169 Cal.App.3d at p. 1138.)  The court found that "[a]lthough the victim's eye was not 'rendered entirely useless,' the injuries were such that the victim could not use her eye for the 'ordinary and usual purposes of life'" and the jury reached the correct verdict in finding the defendant guilty of mayhem. (*Ibid*.)

In *People v. Green* (1976) 59 Cal.App.3d 1, a machete blow to the eye had dislocated the victim's lens, and he lost the ability to focus.  With a corrective lens, the victim's vision was restored to 20/60, rather than the normal 20/20, but the lens distorted his peripheral vision and caused double vision.  (*Id*. at p. 3.)  The court held that substantial evidence showed that the victim's eye was mutilated to the degree that it was useless for ordinary purposes, could not be mended, and the mayhem verdict was correct. (*Id*. at p. 4.)

In the instant case, the evidence clearly showed that Ferraria's eye was useless for the purpose of ordinary sight.  As defendant himself acknowledges, Ferraria was left with only her peripheral vision in her right eye.  Dr. Isaacs testified that the center of Ferraria's retina is damaged, and she cannot see the center of whatever she is looking at.  She sees a black spot in the center of her right eye, and she is classified as legally blind in that eye. Ferraria explained that the black hole in the center of her right eye obscures whatever she looks at.  Outside that black hole it is a blurry gray.  The closer the object viewed is to her eye, the more the object is obscured by the black spot.

11

To say that the victim does not have "ordinary sight" would be an understatement. Merely because Ferraria can function to a certain degree because she still has sight in her uninjured eye does not mean that her right eye was not rendered nearly useless. In the context of eye injuries, section 203 and CALCRIM No. 801 define mayhem as an injury to someone's *eye*, in the singular. Given the degree of injury to Ferraria's eye, it is clear that she cannot use her eye for the "ordinary and usual purposes of life," and the verdict of guilty on the mayhem charge was supported by the evidence.

Accordingly, because there was no substantial evidence that the offense defendant committed was less than the offense charged, the trial court was not obliged to read an instruction on a lesser included offense of mayhem.

## II. Convictions in Counts 2 and 3

### A. Defendant's Argument

Defendant contends that his conviction and the attendant great bodily injury enhancement related to count 3 must be vacated. According to defendant, his conviction for assault with a deadly weapon in count 2 and his conviction of assault by means likely to produce great bodily injury in count 3 were but a single crime. Both counts were charged under section 245, subdivision (a)(1). This statute provides that the offense may be committed either "by means of force likely to produce great bodily injury" *or* "with a deadly weapon or instrument." Thus, the statute defines a single crime, of which defendant may be convicted only once.

### B. Relevant Authority

"Section 954 sets forth the general rule that defendants may be charged with and convicted of multiple offenses based on a single act or an indivisible course of conduct. It provides in relevant part: 'An accusatory pleading may charge two or more different offenses connected together in their commission, or *different statements of the same offense* . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, . . .'" (*People v. Pearson* (1986) 42 Cal.3d 351, 354.)

12

Multiple convictions based on necessarily included offenses, however, are prohibited. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)

At the time of defendant's crime, section 245, subdivision (a)(1) provided in pertinent part that, "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison . . . ." (Stats. 2004, ch. 494, § 1.)  Section 245 "defines only one offense, to wit, 'assault upon the person of another with a deadly weapon or instrument or by any means of force likely to produce great bodily injury. . . .'  The offense of assault by means of force likely to produce great bodily injury is not an offense separate from . . . the offense of assault with a deadly weapon."  (*In re Mosley* (1970) 1 Cal.3d 913, 919, fn. 5; see *People v. Aguilar* (1997) 16 Cal.4th 1023, 1036-1037 [the single offense of aggravated assault may be shown under either of two theories, "a 'deadly weapon' theory or a 'force likely' theory"]; *People v. Milward* (2011) 52 Cal.4th 580, 585 [§ 245 provides different means of committing aggravated assault as a result of the Legislature's determination that certain means of committing the crime deserve greater punishment, such as with use of a firearm, and not because the Legislature intended to define separate crimes].)

The issue of whether a defendant may receive multiple convictions is one of law, subject to independent review.  (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474.)

### C.    *Count 3 Must Be Vacated*

In the instant case, respondent agrees that former section 245, subdivision (a)(1) defines only one crime.  Respondent argues, however, that defendant is mistaken in assuming he committed only one crime.  Respondent asserts that defendant assaulted Ferraria at least twice—first by kicking her so hard that he left a footprint on her back, and second by smashing her face with a bottle.  According to respondent, it is irrelevant that these separate acts occurred during the same fight.  Respondent cites *People v. Reed*, *supra*, 38 Cal.4th at page 1226, for the proposition that "'In California a single act or course of conduct by a defendant can lead to convictions of "*any number* of the offenses charged.'"'"

It is a given that reviewing courts in California have generally affirmed multiple convictions for a single act or indivisible course of conduct. In many of these cases, the indivisible course of conduct resulted in multiple convictions, but the convictions were for violations of multiple statutes. (See, e.g., *People v. Sloan* (2007) 42 Cal.4th 110, 119; *People v. Reed*, *supra*, 38 Cal.4th at pp. 1226, 1230; *People v. Benavides* (2005) 35 Cal.4th 69, 97; *People v. Pearson*, *supra*, 42 Cal.3d at p. 354; *In re Jose H.* (2000) 77 Cal.App.4th 1090, 1095.) In the instant case, we have two convictions for the same statute, and we note that multiple convictions have been affirmed in such cases as well. (See, e.g., *People v. Correa* (2012) 54 Cal.4th 331, 337; *People v. Scott* (1994) 9 Cal.4th 331, 346; *People v. Harrison* (1989) 48 Cal.3d 321, 327; *People v. Shields* (2011) 199 Cal.App.4th 323, 330-331; *People v. Johnson*, *supra*, 150 Cal.App.4th at p. 1473; *People v. Healy* (1993) 14 Cal.App.4th 1137, 1139.) In the latter cases, it is clear that the determination as to whether multiple convictions are appropriate under the same statute is manifestly grounded in the facts of each case. We conclude that in the instant case, only one conviction for aggravated assault is proper, and we believe that the prosecutor's argument, the evidence presented, and the jury's findings support our conclusion.

In count 2, the People alleged and the jury found true that defendant committed an assault with a deadly weapon and personally inflicted great bodily injury upon Ferraria. In count 3, the People alleged and the jury found true that defendant committed an assault by means likely to produce great bodily injury and personally inflicted great bodily injury upon Ferraria. At trial, there was no evidence of any injuries other than the smashed bones and eye injury caused by the bottle. Ferraria did indeed testify that immediately prior to the stunning final blow, which she later attributed to the bottle, she felt some blows on her upper back. She stated in two separate interviews that she believed she might have been kicked, and her father testified that she had a footprint on her back. In this case, however, defendant's attack was accomplished in such a brief period of time and with so few blows that it strains credulity to find more than a single assault under former section 245, subdivision (a)(1). (*People v. Frank* (1865) 28 Cal. 507, 513 ["[w]here, in defining an offense, a statute enumerates a series of acts, either of which

14

separately, or all together, may constitute the offense, all such acts may be charged in a single count, for the reason that notwithstanding each act may by itself constitute the offense, all of them together do no more, and likewise constitute but one and the same offense"].)  This case is unlike those wherein a prolonged attack or an attack using different instrumentalities and causing several injuries was found to justify multiple convictions of the same statute.  (See, e.g., *People v. Healy*, *supra*, 14 Cal.App.4th at p. 1139 [charges and resultant convictions for numerous violations of § 273.5, subd. (a) (corporal injury to a cohabitant), over a period of time are proper]; *People v. Johnson*, *supra*, 150 Cal.App.4th at p. 1473 [convictions upheld for three counts of corporal injury upon a cohabitant (§ 273.5) arising from a single incident where defendant beat the victim in the face and head; held her by the throat against the wall; beat her on her back, hips, and legs; and stabbed her in the upper arm causing two black eyes, a split lip, bruises to the neck, back, and hips, and a puncture wound to the arm].)

Defendant's case is similar to *People v. Ryan* (2006) 138 Cal.App.4th 360 (*Ryan*), where defendant Ryan was charged, inter alia, with several counts of forgery in violation of section 470.  (*Ryan*, at pp. 362-363.)  The *Ryan* court stated that the various subdivisions of section 470 set out different ways of committing a single offense, i.e., forgery.  (*Ryan*, at pp. 364-365, 366.)  Therefore, doing one or more of the proscribed acts with respect to the same instrument constituted only one offense.  (*Id.* at p. 367.)  As a result, with respect to one incident, defendant could not be convicted of two counts of forgery—one for signing the stolen check and another for uttering it at a store, even though these acts were listed in separate subdivisions of section 470.  (*Ryan*, at pp. 365, 369.)  Since this situation occurred with two different instruments uttered at two different stores, the reviewing court vacated one conviction for each incident.  (*Id.* at p. 371.)

*Ryan* distinguished those cases where multiple convictions were charged and convictions were upheld under section 954 for violations of separate statutes.  (*Ryan*, *supra*, 138 Cal.App.4th at pp. 368-369.)  The court stated that although "each statute may represent a different statement of the same offense, it sets out a separate crime, not just— as in the case of section 470—alternative ways in which the *same crime* can be

committed." (*Id*. at p. 369.) We believe that the reasoning of *Ryan* applies to the instant convictions under section 245. As we have noted, circumstances that might alter this view are not present in the instant case.

Moreover, the prosecutor's argument describing the nature of the charges in counts 2 and 3 bolsters the conclusion that multiple convictions were improper. The prosecutor argued with respect to counts 2 and 3 as follows: "Count 2, assault with a deadly weapon. If you try to hit somebody with a deadly weapon, it's an assault. And in this case it was the champagne bottle. There are elements to go through, but they're—there's a lot of legalese, but it's basically just you didn't do it by accident. All of those are contained in this. Basically, if you try to hurt somebody with a deadly or dangerous weapon, you're guilty of this crime. Count 3 is also assault with force likely to produce great bodily. It's another type of assault. It's when you do a serious assault without a weapon. So that would come in play if, let's say, you kick somebody in the face when they're down or you stomp on their head or you hit them in their face, some type of strike not using a weapon. These are kind of in conjunction with one another, so we leave it up to the jury. You could choose one or the other. It's not important at this case whether the defendants are guilty of one or the other. It's basically all the same course of action."

Given that the champagne bottle was destroyed by the police before trial, the prosecutor was apparently leaving the jury the option of finding that Ferraria's facial and eye injuries may have been caused by a kick or a stomp to her head. This argument shows that the People were not proceeding on the theory that defendant committed two discrete acts of aggravated assault. The prosecutor did not assert that defendant's charge in count 3 of assault by means likely to produce great bodily injury was based on his kicking Ferraria. There was no substantial evidence that defendant conducted a prolonged attack on Ferraria by kicking and punching her prior to hitting her with the champagne bottle. Rather, the evidence shows that, while Ferraria was on top of Adams during their wrestling match, defendant punched or kicked Ferraria around the upper back area a few times and then immediately hit her with the bottle. Indeed, Ferraria

16

believed the last blow was another strike by defendant's hands, and she was stunned that he hit her so hard.

It is significant that section 954 and *People v. Reed* merely state that a defendant *may* suffer multiple convictions for different offenses that arise from the same act or course of conduct. (*People v. Reed*, *supra*, 38 Cal.4th at p. 1226.) We believe that in the instant scenario, only one assault was committed and proved. Accordingly, the conviction in count 3 and its sentence must be vacated.

## DISPOSITION

The judgment is modified by vacating defendant's conviction in count 3 and the sentence imposed thereon. As modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17