Filed 1/13/22  P. v. Brown CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID WAYNE BROWN,<br><br>    Defendant and Appellant. | F078884<br><br>(Fresno Super. Ct. No. F18903925)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi C. Kapetan, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# **INTRODUCTION**[1]

Appellant and defendant David Wayne Brown drove his girlfriend, Amber J., to an orchard in a rural area. He shot her in the face and arm. He realized she was still alive, so he dragged her to a canal, kicked her down the embankment into the fast-moving water, even though he knew that she could not swim, and drove away. She managed to climb out of the canal; a passing driver found her sometime later. She was taken to the hospital by helicopter and survived. The gunshot wounds left her with numbness in her face and right hand and visible scars. Defendant was arrested later the same day after leading law enforcement officers on a lengthy high-speed chase.

Defendant was charged and convicted of count 1, attempted premeditated murder based on shooting Amber J.; count 2, aggravated mayhem, also based on shooting Amber in the face and arm; count 3, a separate offense of attempted premeditated murder based on dragging her into the canal and leaving her to drown; count 4, kidnapping, based on dragging her to the canal and kicking her into the water; count 5, felony evasion of a police officer; and count 6, felony attempting to dissuade a witness, based on numerous calls he placed from jail to Amber; and the jury found true firearm and great bodily injury enhancements. He had two prior strike convictions and prior serious felony enhancements.

Defendant was sentenced to a determinate term of 51 years plus an indeterminate term of 150 years to life.

On appeal, defendant argues that he could not be convicted of two separate charges of attempted murder, and he should not have received consecutive sentences for those two counts, because he was engaged in one continuous course of conduct when he shot the victim and then pushed her into the canal, with the single intent to kill. He also

---

[1] Pursuant to California Rule of Court, rule 8.90, the full name(s) of the victim and witnesses involved in the underlying proceedings have been suppressed throughout this opinion in order to protect personal privacy interests.

argues the court improperly imposed consecutive sentences for count 1, attempted murder based on shooting the victim in the face and arm, and count 2, aggravated mayhem, because the mayhem conviction was based on the same shooting as the attempted murder charge. We affirm.

## FACTS

Amber J., who was a tattoo artist, met defendant on Facebook in mid-February 2018, and they began a romantic relationship. They regularly used methamphetamine together.[2]

In 2018, Amber J. and her son were living with her friend, Bobbie P., in a rural area near Centerville and Reedley. Bobbie testified that defendant frequently visited Amber when they started dating in February 2018. The relationship between defendant and Amber was initially good, but things changed, and they argued all the time. In March or April 2018, Bobbie's husband told defendant not to come around when Amber was present because their relationship was toxic. Defendant would park at the end of the long road to their house and tell Amber to walk out and meet him.

**Defendant's prior acts[3]**

On or about April 2, 2018, Amber J. was still living with her friend, Bobbie P., and argued with defendant during a telephone call.

After the call, defendant showed up at Bobbie's house. There was a very long driveway between the house and the main road. Defendant drove up and down the driveway, yelled at Amber and caused a scene. Amber decided to talk to him and walked down the long driveway. Defendant was irate because of what she said during the telephone call.

---

[2] Amber J. was previously convicted of receiving stolen property and had two misdemeanor convictions for domestic violence.

[3] The court overruled defense objections and granted the prosecution's motion to introduce the following evidence of defendant's prior acts of domestic violence pursuant to Evidence Code section 1109.

Defendant told Amber J. to get into his car, which she did. Defendant drove erratically into a nearby orchard until his car hit a stump. Defendant told her to get out of the car. She complied because she was scared. She testified that defendant hit her in the face and head three times.

Defendant drove her to another part of the orchard. At some point, he took her cell phone away from her. Defendant produced a knife and threatened to stab her. Amber J. begged him to stop, and they got into "a very emotional, weird fight." Defendant handed her the knife and said to stab him. She threw the knife out the window. Defendant asked what she would say if the police arrived. Amber agreed to say they were just doing a "kinky sex thing."

Amber J. testified that they got out of the car, and defendant "pushed" her into the trunk and tied her arms with an electrical cord. He closed the trunk lid and started driving again. Amber was able to untie herself, and she used the interior emergency latch to open the trunk. When the car stopped, she jumped out and found herself at a car wash. She ran across the street to a store to get help. Defendant saw her, got back into his car, and drove after her. He confronted her in the middle of the street and tried to get her back into the trunk.

Someone called the police and officers arrived at the scene. Amber J. lied and told the officers the story she had previously agreed to say – that they were involved in "some kinky sex thing and that we were just playing around." She lied to save defendant because she knew he would go to prison if she told the truth.[4]

---

[4] There was also evidence about the prior act based on defendant's exchange of messages with William H., who knew both defendant and Amber J. On the nights of April 2 through 3, 2018, defendant asked William if Amber was with him; William said no. Defendant wrote that she had "crossed the line," he needed to find her, and William would know when he found her.

On April 3, 2018, defendant sent a message to William H. that he was going to "take" a life that day. William asked what happened, and later sent another message and asked if defendant was okay. Defendant replied that he totaled his car and almost died.

4.

Amber J. admitted that at a later time, she told a friend about the trunk incident but lied when she falsely claimed that defendant raped her.

On Mother's Day in 2018, defendant visited Amber J. She was sick, asked him to go to the store and get some medicine, and gave her debit card to him. Defendant disappeared with the debit card, placed some charges on it, and left it on her car a few days later.

Amber J. testified that they stopped seeing each other after the debit card incident. She learned that defendant was seeing Samantha S. Amber knew that William H. was living with Samantha; Amber previously lived with William.

Amber J. admitted she confronted Samantha S. with a gun, punched her in the face, and later threatened her on Facebook. Amber testified the shotgun was not loaded, and she put it down before she hit Samantha with her fists. Amber was drinking when she sent the message to Samantha that she would do it again and pull the trigger.

## THE CHARGED OFFENSES

In June 2018, Amber J. and her son were still living with Bobbie P. On the afternoon of June 3, 2018, defendant sent Amber a message and asked to meet her at the end of the road by Bobbie's house. She replied that she was staying with William H. Defendant sent more messages and accused her of not wanting to see him.

On June 4, 2018, defendant sent messages to Amber J. and asked to meet her. She refused, they exchanged more messages and a call, and argued about their relationship. Defendant's last message was: " 'See you then,' " and Amber replied with a "thumbs up" sign.

On the evening of June 4, 2018, defendant placed a videocall to Amber J., said he wanted to see her, and asked if she wanted to get high. They agreed to meet the next morning at the end of Bobbie P.'s driveway.

---

Detective Razo testified that based on the date, these messages appear related to the incident when defendant tied up Amber J. and put her in his trunk.

At 8:21 a.m. on June 5, 2018, the day of the charged offenses, defendant sent Amber J. a message and asked to meet her. She asked why. Defendant replied: " 'Just get high, take you back.' "

At 8:32 a.m., Amber J. sent a message that she was "walking" and asked defendant where he was. There were no further messages or calls from Amber to defendant.

It was later determined that Amber J. left her cell phone at Bobbie P.'s house when she met defendant.

**Defendant picks up Amber J.**

At 9:10 a.m. on June 5, 2018, defendant sent Amber J. a message that he was late. At 9:15 a.m., he called Amber, but it did not connect, and then he sent a thumbs up sign.

Amber J. testified that around 9:30 a.m., defendant arrived at Bobbie P.'s driveway and she got into his car. Defendant drove a silver Nissan Altima that had black primer on parts of the car where it was being repaired.

Amber J. testified that defendant frisked her when she got into his car. He drove into an orchard and parked about six feet from a canal. They talked, smoked marijuana, and started to engage in sexual acts. Defendant told her to get out of the passenger seat and walk to the driver's side so they could continue having sex. She got out of the car, walked around the back, and approached the driver's door.

**Defendant shoots Amber J. (count 1, attempted murder; count 2, aggravated mayhem)**

When Amber J. arrived at the driver's side of defendant's car, he was standing outside the vehicle. He leaned back into the car, and then turned around and shot her in the face. Amber heard a gunshot and was knocked to the ground. Her face was bleeding, her dentures were broken in half, and her ears were ringing. She knew something was wrong but did not immediately realize what happened. The bullet entered her nose and exited through her jaw.

Amber J. was lying on the ground and on her back, and bleeding from her facial wounds; defendant stood over her. She testified: "[Defendant] walks up on me and points the gun, and I see it and I pulled up my arm and he shot it again." The bullet went through her raised right arm and into her shoulder.

**Defendant drags Amber J. to the canal (count 3, attempted murder; count 4, kidnapping)**

After defendant fired the second shot, Amber J. was still lying on the ground on her back and bleeding from the gunshot wounds. Defendant grabbed her foot and dragged her to the canal, feet first, holding one foot. When they reached the top of the canal bank, defendant yelled at her to get into the canal water. She tried to scoot down the steep embankment. Defendant kicked her in the shoulder, and she fell down the steep embankment and into the water.[5] Amber testified that he kicked her wounded shoulder with such force that he left a shoe print on her back, and she had trouble breathing.

Amber J. testified that defendant knew she could not swim. The canal water was moving swiftly, and it was too deep to touch the bottom; Amber started to float away. She heard defendant get into his car and drive away. She thought she was going to die and did not want her children to find her body floating in a canal.

Amber J. testified that she grabbed the side of the canal and held onto a rock. She was able to climb out of the water, over the embankment, and back into the orchard. She thought she had been in the water for about 10 minutes. She was afraid she would die in the orchard, "[a]nd I started thinking no one would know I was with him, so I started writing his name the best I could, because with my arm that had a hole in it, trying to write his name with the rocks in blood." She began to pass out. She later heard a car drive up, and someone told her that she was going to be okay.

---

[5] In closing argument, the prosecutor argued count 4, kidnapping, was based on defendant's act of dragging Amber J. to the canal.

7.

**Defendant's location**

The GPS data on defendant's cell phone showed his movements on June 5, 2018. At 9:34 a.m., he was at the canal bank where Amber J. was shot, near Floradora and Macdonough, north of East Belmont in Fresno County. By 9:54 a.m., defendant was a "good distance" away from that area, and proceeding on Kings Canyon Road toward Clovis, where he lived. At 10:36 a.m., he was by his residence in Clovis.

**Defendant's text messages to Amber J.**

At 10:59 a.m., defendant sent a message to Amber J. saying that he had fun, he missed her, and to call him. Defendant then called Amber, but the call did not go through.

At 1:29 p.m., defendant sent messages to Amber J. to call him and asked her not to be mad at him. There were no further messages from defendant to Amber.

**Discovery of Amber J.**

Around 11:00 a.m. that day, Christopher C. was driving to his ranch when he saw someone in an orchard, lying on the side of a canal bank. Christopher drove into the orchard and up to the canal, where he found Amber J. She was lying on her back and covered in blood. She opened her eyes and asked for help. He called 911.

Deputy Milkovich responded to the scene and found Amber J. lying in the fetal position. She was bleeding from gunshot wounds to her neck, chin, and arm, and her face and body were covered with blood. Milkovich asked her what happened. Amber said, " 'David Brown shot me. He did it. He's on parole.' " Amber said she had been in the canal but did not know how much time had passed.

Deputy Milkovich called for emergency personnel. She kept talking to Amber J. to keep her from losing consciousness.

Deputy Milkovich testified it was a very warm day. Amber J. was bleeding from her wounds, but her clothing and the blood on her chest were dry. Based on the temperature, and dry clothing and blood, Milkovich believed Amber had been lying in the orchard for some time before she was found.

**Amber J.'s injuries**

Emergency personnel treated Amber J. at the scene and transported her to the hospital by helicopter.

The first gunshot entered Amber J.'s nose and exited through her jaw. She lost teeth, suffered permanent numbness on the right side of her face, and the wound left a long scar on the lower left side of her jaw.

The second gunshot went through her right arm and neck, severed a tendon, and lodged in her shoulder. It resulted in numbness in her right arm, severely restricted movement of fingers on her right hand, and impaired her ability to work as a tattoo artist.

**Investigation at the scene**

There were expended .380-caliber cartridges by the canal bank. There were also bloody broken dentures on the ground. The canal's embankment was very steep, and the water was flowing fast.

Deputy Milkovich testified that Amber J. was found about 30 to 35 feet from the canal bank, in a sandy area with powdered dirt and very small rocks and pebbles. There were two separate trails of drag marks in that area. The two trails were two or three feet apart. One trail was bloody and led to the canal, down the embankment, and to the water's edge. The criminalist estimated that it was about 24 feet from the beginning of the blood trail to where the drag marks ended at the canal bank. The second trail appeared to begin at the canal water, continued over the embankment, disturbed the leaves, led into the orchard, and ended close to the area where Amber was found.

9.

Deputy Milkovich testified there was dirt and foliage on the back of Amber J.'s hair, but not on her face or the front of her body. The area by the embankment was full of leaves, sticks, and larger rocks, consistent with the foliage on the back of Amber's hair.

The criminalist found four tire tracks in the orchard. There was one pair of shoe prints by the tire tracks, where the dirt was softer. The criminalist did not find any shoe prints by the drag marks because that area was too rocky.

**Arrest of defendant (count 5; felony evasion)**

Detectives Razo and Chalmers of the Fresno County Sheriff's Department contacted Amber at the hospital. Amber J. said that defendant shot her and wanted her dead. She used methamphetamine that day, and defendant was the only person who could inject her because she had bad veins.

The sheriff's department set up surveillance near defendant's residence in Clovis. At 5:17 p.m. on June 5, 2018, Deputy Kitchens was stationed near the residence and saw defendant drive by in a silver Nissan Altima. He followed defendant and activated the lights and siren on his marked vehicle to perform a traffic stop. Defendant accelerated and led officers on a lengthy, high speed chase. Defendant ran through stop signs and red lights, nearly hit other vehicles, and drove against traffic. Defendant avoided driving into a spike strip and kept going even after his vehicle was intentionally rammed by a patrol car. Finally, another deputy used his squad car to pin defendant's vehicle against a tow truck, and defendant's car crashed.

The deputies surrounded defendant's car and tried to get him out. They had to break open the car's windows to reach him. Defendant raised his hands but resisted and was pulled out of the vehicle. He continued to resist as the deputies placed him in handcuffs.

Samantha S. was also in the car with defendant.

10.

# THE INVESTIGATION

**Veronica G.'s testimony about the gun and the car**

Amber J. testified that sometime prior to the charged offenses in this case, defendant said he had obtained a gun from a girlfriend named "Valerie" or "Veronica," and it had "jammed up."

During the high speed chase, defendant was driving a silver Nissan Altima that belonged to Veronica G.

Veronica G. testified at trial that she was defendant's girlfriend at the time of the charged offenses, and they met on an online dating site in September 2017. She lived in Madera and defendant lived in Clovis. In February 2018, she saw some messages to defendant from Amber J., but defendant claimed she was just a friend. Veronica's relationship with defendant seemed different toward the end of May 2018, and it became difficult to contact him.

Veronica G. testified that on May 5, 2018, she bought a handgun and ammunition from a store for her personal safety because of unusual vandalism around her house. Defendant was with her when she bought the gun. On May 15, 2018, after the waiting period, she picked up the gun. She kept the gun in a black case, left the key in the lock, and never fired it.

Veronica G. once saw defendant holding her gun when he was at her house. She knew that defendant was a felon and told him to put it away. After that time, she tried to hide the gun in different places in her home and car to keep it away from him.

On the morning of June 5, 2018, Veronica G. was at work in Madera. Later in the morning, defendant called and said he was heading to her house in Madera. She drove home to unlock the house for defendant, and he was there and waiting for her. She went back to work, and then drove home again at lunchtime. Defendant was still there and

seemed normal.  They had lunch together, and defendant asked to borrow her car because he was having a problem with a tire.[6]

Veronica G. testified that they both drove silver Nissan Altimas, "different year, same color," but defendant's car looked different because it had black primer on the hood.

Veronica G. testified that they left her house in her silver vehicle.  Defendant dropped her off at work and drove away in her vehicle.  Later in the afternoon, just before she left work, defendant called and asked her to change his cell phone number because he was on her account.  Veronica did so, but she did not see him again that day and had to get a ride home.[7]  At 3:00 a.m. the next morning, defendant called her from jail.

Veronica G. testified that deputies later arrived at her house.  Defendant's silver Nissan Altima with the black, primer hood was still parked there.  Veronica identified the vehicle that defendant crashed after the high speed chase as her silver Nissan, based on the license plate number and lack of primer.

The deputies asked Veronica G. about her gun.  She looked in the place where it was hidden in her bedroom, and realized the gun was gone.  She and the deputies discovered defendant had thrown one of the floor mats from his car into her trash can; it had an apparent bloodstain.

**Search of the cars and DNA evidence**

As explained above, defendant was driving Veronica G.'s silver Nissan Altima when he led the deputies on the high speed chase and crashed.

The trunk of the crashed car contained unfired rounds of .380-caliber Harnady brand ammunition, a gun case, a gun lock, and two sets of keys.  There was paperwork in

---

[6] The GPS data from defendant's cell phone showed that at 11:37 a.m., defendant was by Veronica G.'s house in Madera.

[7] Sometime between 5:30 p.m. and 6:30 p.m. on June 5, 2018, defendant's cell phone number was changed.

the trunk consisting of a dealer's record showing Veronica G. purchased a Llama brand .380-caliber handgun, dated May 5, 2018, with a delivery date of May 15, 2018. Her name was on the side of the gun case.

The gun case contained DNA from at least four potential contributors. The forensic biologist testified it was 138,000 times more likely than not that defendant's DNA was on the case.

The investigating officers found defendant's Nissan with the black, primer hood, that he used to drive Amber J. to the canal bank, parked at Veronica G.'s house. There was blood on the outside panel of the driver's side rear door; the blood contained Amber's DNA profile.

**Additional forensic evidence**

A firearms expert testified the bullet removed from Amber J.'s body was a "nominal .38[-] caliber" hollow point, that was consistent with the unfired cartridges found in the trunk of Veronica G.'s car. The rifling characteristics on the fired bullet were consistent with a Llama-manufactured firearm.

A photograph was recovered from defendant's Facebook page, posted on May 15, 2018. It showed defendant posing with a firearm at his house. Veronica G. testified the photograph showed defendant holding the gun that she purchased, and she had no idea that he took it from her home.

A firearms expert testified defendant was holding a "Llama 380"-caliber handgun in the photograph. Such a weapon was prone to jamming and required racking the slide to clear it.

The firearm used to shoot Amber J. was never located.

## THE ELECTRONIC EVIDENCE

**Defendant's messages to Kristine M.**

Defendant and Kristine M. communicated on Facebook in the days and weeks before defendant shot Amber J. He sent a series of urgent messages to her on June 5, 2018, the day of the charged offenses.

At 8:24 a.m., Kristine M. sent defendant a message and he responded. At 9:47 a.m., there was a missed call from defendant to Kristine. She replied she would be one second. Defendant called her six seconds later, and she sent a message that she could not talk.

At 9:48 a.m., defendant again tried to call Kristine M., she did not respond, and then he sent a message to her that only said: "911, 911."

At 11:15 a.m., defendant called Kristine M., and the call went through. Within minutes, they exchanged more calls that did not go through.[8] There were several more missed calls between them that day, followed by completed calls at 3:28 p.m. and 5:12 p.m. Kristine repeatedly tried to reach him after 5:17 p.m., but he did not respond; defendant was involved in the high speed chase by that time.

## DEFENDANT'S JAIL CALLS AND VISITS

Defendant remained in custody after he was arrested in this case. He had numerous calls and contacts with various witnesses prior to his preliminary hearing and trial.

**Veronica G.**

On July 9, 2019, defendant submitted a request to marry Veronica G. in jail. She regularly visited him in jail, but they were not married. Defendant and Veronica

---

[8] Based on the GPS data from defendant's cell phone, his calls to Kristine M. occurred after he left the canal bank, and as he was heading back to Clovis and then to Madera.

14.

exchanged numerous letters about continuing their relationship when he got out.  He also wrote letters to other women discussing his hopes for their future romantic relationships.

Veronica G. testified that she visited defendant in jail several times.  During the visit of October 3, 2018, shortly before the trial, defendant was upset because she had been subpoenaed to testify, and said it was "just a misdemeanor" to violate a subpoena.  She felt he was trying to discourage her from testifying, but she always intended to appear and would not lie for him.

Defendant's jail visit with Veronica G. on October 3, 2018, was recorded, and the transcript introduced into evidence.  Defendant accused her of not caring what was going to happen to him and helping the prosecutor convict him.  Defendant said she should take a vacation and not testify.  Veronica said she had no choice and did not want to "put [him] away."  He again accused her of not caring for him and said she was not helping "the home team."  Defendant told her that it was a misdemeanor if she did not show up and testify, and she could have taken a vacation and done a lot of things to avoid testifying, but she was "helping them give me life."

Defendant said he would be angry at her for the rest of his life but added that he should not have put her in this position.  Veronica G. agreed and said, "You shouldn't have!  I've always done what you asked."

> "[Defendant]:        [Y]ou're right.  And that's fine.  That's fine.  I understand your reasoning and say all that, say whatever, but it, it doesn't change the bottom line.  You're right.

> "[Ms. Gordon]:        [Inaudible]

> "[Defendant]:        You're right.  Yup.  *Bottom line is I should've reracked that mother[f\*\*]ker and shot her again, huh?*

> "[Ms. Gordon]:        [Inaudible]

> "[Defendant]:        *Should've got a more expensive gun, huh?  Shot her like 4 times in the face.  That's what I should've done*.

"[Ms. Gordon]:        [Inaudible]

"[Defendant]:        Nah, I can make it where you don't need to help them at all.  You like that?  Too late."[9]  (Italics added.)

**Amber J. (count 6; attempted dissuasion of a witness)**

At 4:20 p.m. on July 16, 2018, defendant called Amber J. from jail.  He told her to do the "right thing," not show up, and get him back with his daughter.  At 4:30 p.m. on the same day, Amber received a jail call from Pacer Hampton, who was housed in the cell next to defendant.  Defendant, Hampton, and Amber were on the call.  At 7:28 p.m. on the same day, defendant again called Amber and told her to go "M.I.A." and claim head trauma.

On July 17, 2018, defendant called Amber J., and they appeared to know the call was being monitored.  They discussed how her memory was not clear, and defendant told her to call his attorney.  Amber said she loved him and talked about getting married. Defendant said that was not possible because the district attorney would not allow it. Defendant mentioned she should talk to his attorney.  Amber said she loved him.[10]

On July 18, 2018, defendant called Amber J., tried to find out if she talked to his attorney, asked for help to get his case dismissed, said he hoped she would follow through, and promised they would be together in the future.

On July 29, 2018, Amber J. received a jail call from Richard "Bad Boy" Caldwell, another inmate housed near defendant's cell.  Defendant's voice could be heard in the background, telling Caldwell what to say.  Caldwell told Amber not to show up for the

---

[9] Amber J. testified that sometime prior to the charged offenses in this case, defendant said he had obtained a gun from a girlfriend named "Valerie" or "Veronica," and it had "jammed up."  The firearms expert testified defendant was holding a "Llama 380"-caliber handgun in the photograph, and this gun was prone to jamming and required racking the slide to clear it.

[10] It was stipulated that Amber J. called defendant's attorney several times, and the attorney never returned the calls.

preliminary hearing and she should talk to defendant's attorney. Amber replied, " 'He did it. Hey dude, he did it.' "

On August 3, 2018, defendant called Amber J. and again told her not to come to court. Defendant warned that someone would look for her and try to bring her into court, it would only be a misdemeanor if she did not show up, and she should "lay low" for a few weeks, and he would be home. Defendant also said that she should misstate her testimony if she decided to appear.[11]

On August 16, 2018, defendant's preliminary hearing was held, and Amber J. appeared in court and testified. She was ordered to return after the lunch break to complete her testimony. Richard "Bad Boy" Caldwell called Amber from jail at 12:38 p.m., during the court's lunch break when defendant was back at the jail. Defendant's voice could be heard in the background. Amber returned to court and completed her testimony.

**Amber J.'s testimony about defendant's calls**

Amber J. testified that after defendant shot her and threw her in the canal in June 2018, it took her a "few months" to stop loving him. She was very confused in July and August 2018 and felt sorry for him. Amber talked to defendant several times while he was in jail, said she loved him, and sent him a care package. Defendant called Amber all the time and told her not to come to court. She told defendant she might move out of state.

Amber J. acknowledged that she also received calls from inmates Pacer Hampton and Richard Caldwell but denied that they told her not to come to court. Caldwell only expressed concern for her safety.

Amber J. eventually changed her phone number and defendant stopped calling her.

---

[11] Defendant's pre-preliminary hearing was scheduled for July 30, 2018. The preliminary hearing was originally set for August 9, 2018, it was continued, and held on August 16, 2018.

## DEFENSE EVIDENCE

**Samantha S.**

Samantha S. testified that she met defendant in October 2017, through Hollis, her former boyfriend. Samantha's relationship with defendant became romantic by April 2018. She also knew Amber J. Samantha testified she was currently subject to prosecution for a misdemeanor charge.

Samantha S. testified about an incident that occurred in May or June 2018, about two weeks before Amber J. was shot. Hollis picked up Samantha and drove her to his house, where Amber was waiting. Amber had a shotgun, and Amber and Hollis took her into a back room. Amber hit Samantha on the nose with the end of the shotgun, hit her two more times, and then Hollis raped her. Samantha testified that she suffered two black eyes, a broken nose that was "hanging to one side," and a skull fracture. However, she did not seek medical attention or call the police because she was afraid Amber was going to kill her.

On June 5, 2018, the day of the shooting, Samantha S. was at a friend's house in Fresno, and sent a message to defendant to pick her up. Defendant arrived, she got in the car, and they headed to defendant's house. However, the police drove behind them and the high speed chase ensued. Defendant did not say anything during the chase, and Samantha kept saying that she loved him.

Samantha S. spoke to the police after the chase and gave a false name. She never mentioned that Amber J. had previously assaulted her.

Samantha S. testified that just before defendant's trial started, she received a Facebook message from Amber J., who threatened to find her, beat her up, and "this time she was going to pull the trigger."

**Defendant's neighbor**

Mary C. lived next to defendant in Clovis and described him as a good kid. On the morning of June 5, 2018, she was emptying the RV trailer parked in front of her

18.

house.  She started around 7:00 a.m. and finished at 9:30 a.m.  She saw defendant in his garage during that time.  He offered to help but she declined.

**Defendant's trial testimony**

Defendant testified that he had a prior conviction for felony assault by means likely to cause great bodily injury in 2003, that was later reduced to a misdemeanor; two convictions for felony bank robbery in 2004; and a conviction for felony attempted robbery in 2012.

Defendant testified he previously used methamphetamine, his wife died of a drug overdose in 2012, and he stopped using after that.  He met Amber J. on Facebook in January or February 2018.  They were "casually dating," but defendant had "many partners" and did not consider their relationship exclusive.  Defendant started smoking methamphetamine again with Amber, and he helped her inject methamphetamine.

Defendant admitted he sent a Facebook message to Hollis that he was going to "blast" Amber J., but he was angry because they had argued, and Amber had lied about him on Facebook.  Defendant admitted that two days after the messages to Hollis, he tied up Amber and placed her in the trunk of his car.  Defendant testified the trunk incident was Amber's idea for them to engage in a sexual fantasy.  Defendant testified that Amber falsely accused him of rape.

Defendant testified that he communicated with Amber J. on the day before the shooting, and they agreed to meet early in the morning on June 5, 2018, because they were going to have sex and she needed help to inject methamphetamine.  Defendant overslept and sent her a message around 8:00 a.m.

### *The gun*

Defendant testified Veronica G. stayed at his house in Clovis two nights before Amber J. was shot.  At that time, defendant saw Veronica's gun in the trunk of her car and took it without her permission.  He planned to trade the gun for methamphetamine with a friend of Amber's, a man known as "Rage," who was a member of a motorcycle

club that she associated with. Defendant took the gun with him when he drove to meet Amber.[12]

### *Defendant picks up Amber J.*

Defendant testified he picked up Amber J. close to 9:00 a.m., and she asked for help to inject methamphetamine. He drove out to the orchard, tried to inject her with syringes, and could not do it because of her veins. Instead, they smoked marijuana and engaged in sexual relations while they waited for Rage to arrive.

Defendant testified that Rage, arrived in the orchard on a motorcycle. Defendant grabbed the gun, and they both got out of his car. Amber J. took the gun to Rage; she and Rage talked outside of defendant's presence, and Rage shook his head. Amber returned to defendant and said she only got about an ounce of methamphetamine for the gun. She said Rage was unhappy that defendant was there because no one else was supposed to be present.

Amber J. said she was going to "stay with her homeboy" in the orchard. Defendant was "glad that I got what I wanted," and drove away, leaving Amber in the orchard with Rage and the gun.[13]

### *Defendant switches cars*

Defendant testified that he drove back to his house in Clovis, called some of the other women he was seeing, and arrived home around 9:30 a.m. He then called Veronica G., drove to her house in Madera, and arrived around 10:45 a.m. or 11:00 a.m. Veronica came home, unlocked the door, went back to work, and then returned at

---

[12] Amber J. testified that she had previously dated the president of the "Screaming Demons" motorcycle club and described the group as "a bunch of old guys" who did charity work and raised money for children's hospitals.

[13] The prosecution recalled Amber J. on rebuttal, and she testified that no one arrived on a motorcycle or met them in the orchard, they did not trade a gun for methamphetamine, and she was only there with defendant.

lunchtime. They had lunch, and defendant asked to borrow her car because there was a problem with a tire on his car. She agreed.

### *Defendant drives back to Fresno*

Defendant left Madera in Veronica G.'s car around 1:30 p.m. He drove to Fresno to pick up Samantha S. Before he reached her location, he got a call from Amber J.'s roommate, Bobbie P., who said the police were at her house, they had a photograph of defendant, and they were asking about Amber.

Defendant arrived at Samantha S.'s residence and used methamphetamine. After about one hour, defendant and Samantha left together, and the high speed chase began shortly afterwards. Defendant testified he tried to evade the police because he thought they were going to arrest him based on Amber J.'s false allegation that he raped her during the April 3, 2018 incident when he put her in the trunk. Defendant admitted he only stopped when a squad car rammed his vehicle, and he was arrested.

Defendant admitted that he spoke with the officers after the high speed chase and told them that he took Amber J. home from the orchard. He lied because he was afraid of being arrested for possession of the handgun and methamphetamine. He also did not want to "snitch" about Rage because he was afraid of him. Defendant testified he was now telling the truth because he did not want to go to jail for the rest of his life for something he did not do.

**REBUTTAL EVIDENCE**

**Bobbie P.**

Bobbie P. testified in rebuttal about her contacts with defendant before and on the day of the charged offenses. Bobbie testified that she went to work on the morning of June 5, 2018. She did not know that Amber J. had left the house with defendant. Bobbie went home at 11:00 a.m. because she was supposed to take Amber to an appointment at noon, but Amber was not there. Amber's son was there and said that his mother was going to meet defendant and had left her cell phone in the house. Sometime between

21.

11:30 a.m. and 11:45 a.m., Bobbie called defendant, asked where Amber was, and said she was angry because they were supposed to meet for an appointment, but Amber was not at the house. Defendant said he dropped her off at Bobbie's house.[14]

Bobbie P. started to drive back to work. Amber J.'s son called her and said that detectives were at the house. Around 1:00 p.m., Bobbie sent a text message to defendant and also called him. She told him about the detectives and asked what was going on. Defendant said he did not know, and again said he had dropped off Amber at Bobbie's house.

Bobbie P. found out the detectives at her house were from the homicide division and became concerned. She contacted defendant again around 3:00 p.m. and asked where Amber J. was. Defendant assured her that he had dropped off Amber at the house earlier that day.

**Further investigative evidence**

Detective Chalmers testified he interviewed Samantha S. on June 5, 2018, after she was found in the car with defendant following the high speed chase. Samantha did not say that Amber J. had previously assaulted her. Chalmers took her picture, and she did not appear to have been beaten and did not have any visible injuries, such as bruises or black eyes.

Detective Chalmers again interviewed Samantha S. about two weeks before defendant's trial started in October 2018. During that interview, Samantha reported for the first time that Amber J. had assaulted her on June 1, 2018. Samantha reported she was with Hollis, he woke her up, she went to the door, and Amber was there. Amber hit her in the face with a shotgun, inflicting two black eyes, breaking her nose, and fracturing the left side of her face, and she still had trouble breathing.

---

[14] The GPS data from defendant's cell phone showed that at 11:37 a.m., defendant was in the area by Veronica G.'s house in Madera.

22.

Detective Razo checked law enforcement data bases for a motorcycle club member known as "Rage" but found no evidence of such a person.

## CLOSING ARGUMENTS

**The prosecutor's closing argument**

In closing argument, the prosecutor argued defendant was guilty of counts 1 and 3, the two charges of attempted murder, because they occurred on "different occasions, different acts," based on what happened in the orchard: "Two different times he took two different acts to try and [k]ill her so they're charged in two separate counts."

The prosecutor stated count 1, attempted murder, was based on "shooting the victim. He intended to murder her when he shot her." He shot Amber J. in the face while she was standing by the driver's side of his car, her blood splashed on the side of the car, and then he shot her in the arm. The prosecutor cited the photographs of the victim that were taken at the hospital and introduced into evidence, and stated they showed how the gunshot entered through her nose, "[s]plit the whole bottom side of her throat," and there were scars on her nose and the left side of her mouth. The prosecutor argued there was "no way you shoot someone in the face without intending to kill them."

The prosecutor argued that count 3, the second charge of attempted murder, "was throwing her into the canal to drown." Defendant grabbed Amber J.'s foot and dragged her to the top of the steep canal bank, while she was bleeding from the gunshot wounds. Defendant told her to get into the water, kicked her in the back, and she fell into the deep and fast-moving water "for her to die and drown" because defendant knew she could not swim. The prosecutor argued that throwing her into the canal was the "perfect place to finish the job he started with that gun," and he left her "in the water to die and he takes off."

The prosecutor further argued that each act constituted a premeditated and willful attempted murder. As to count 1, the evidence showed he had been planning to shoot her for days since he took the gun from Veronica G., he frisked Amber J. before she got into

23.

his car, he drove to a secluded location in the orchard, and he told Amber to get out of the car and walk to the driver's side to give him time to pull the gun.

As to count 3, defendant had "a choice" after he shot her twice, and he could have called 911 for help or just left her there.

> "Once the gun jammed, he had a choice. He could abandon what he was doing and go home, or call 911, seek medical aid, regretting the decision he made, or he could put into effect a plan B, and he chose plan B. Now, he had regrets that day. We heard his regrets. His regret was that he didn't rerack the gun and shoot her again because plan B didn't work. His regrets weren't that he didn't do it. His regrets were that he got pushed into that place. His regret was that he didn't finish the job, and when [he] dragged her to that canal, he was hoping that was what would do it. He knew she couldn't swim. He kicked her hard where he had already wounded her, and he put her in water where it was deep and fast-flowing. Putting someone in that state, who already can't swim into that water, that's asking them to die, and it's hoping that when they do, the water will carry away the evidence. That's the evidence of premeditation in this case. There is something instrumental about what he did. It was designed to make it easier for him to get away from the crime, and, again, he, had a choice. He made that cold, calculated decision the law requires. The gun jams and he says, 'What am I going to do now? What I'm going to do, I'm going to grab her by the foot, drag her, kicking and crying to the canal bank, down that slope, into that water, and kick her again there and hope she dies. He made that choice. That choice was deliberate, that choice was willful, and that choice was calculated. It was premeditated within the meaning of the law."

**Defense counsel's closing argument**

Defense counsel argued Amber J. was not credible because of her inconsistent statements, she had committed violent acts against other people, and she admitted making false allegations against defendant about raping her during the trunk incident. Defense counsel acknowledged that "[s]hooting someone in the face is just shooting someone so they die," but cited defendant's testimony about the man on the motorcycle arriving in the orchard and argued that person was the likely suspect. Defense counsel suggested Amber's blood was on the outside of defendant's car because they were using syringes to inject methamphetamine. Counsel asserted Amber lied about being thrown into the canal

24.

because her clothes were dry when the deputy responded to the orchard, and "since she was never in the canal," defendant was not guilty of attempted murder or kidnapping.

## PROCEDURAL BACKGROUND

On October 18, 2018, a first amended information, further amended by interlineation, was filed in the superior court charging defendant with count 1, attempted premeditated murder of Amber J. "by shooting her in the face & arm with a handgun" (Pen. Code, §§ 664, 187);[15] count 2, aggravated mayhem (§ 205); count 3, a separate charge of attempted premeditated murder, "by dragging her into a canal & leaving her to drown"; count 4, kidnapping (§ 207, subd. (a)); count 5, felony evasion of a police officer (Veh. Code, § 2800.2, subd. (a)); and count 6, felony attempting to dissuade a witness, Amber J. (§ 136.1, subd. (a)(2)).

As to counts 1 and 2, attempted murder and aggravated mayhem, it was alleged defendant personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)); and as to counts 3 and 4, the separate charge of attempted murder and kidnapping, that defendant personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)).  It was further alleged that defendant had three prior strike convictions, two prior serious felony enhancements (§ 667, subd. (a)(1)), and one prior prison term enhancement (§ 667.5, subd. (b).

**Trial and verdict**

On October 16, 2018, defendant's jury trial began.

On November 1, 2018, defendant was convicted of all six counts, and the jury found the great bodily injury and firearm enhancements true.  Defendant waived his right to a jury trial and admitted the prior conviction allegations.

---

[15] All further statutory references are the Penal Code unless otherwise stated.

## SENTENCING

### Sentencing briefs; defendant's postverdict statements

The People filed a sentencing brief and attached transcripts for two calls defendant made from jail after he was convicted. During a call with his mother, defendant said, " 'I shot that bitch. I'll shoot that bitch again [if] they ever let me out.' " During a call with Amber J., defendant told her, " 'You get my life and I got your livelihood.' "

Defendant's sentencing brief objected to the prosecutor's reliance on his postverdict jail calls and asked the court to exclude the transcripts from consideration when imposing sentence. Defendant acknowledged that rule 4.414 of the California Rules of Court allowed the court to consider whether the defendant is "remorseful," but that only applied to the determination of probation, and defendant was statutorily ineligible for probation and there were no unusual circumstances.

Defendant requested dismissal of the prior strike convictions "based on the severity of the punishment that [he] is already facing without the three strikes punishment," so that enhancing his sentence "serves no practical purpose."

Defendant also asked the court to find counts 1 through 4 (the two counts of attempted murder, aggravated mayhem, and kidnapping) constituted a single course of conduct, and that the sentences for counts 2, 3, and 4 should be stayed pursuant to section 654.

### Sentencing hearing

On February 20, 2019, the court held the sentencing hearing and stated it had reviewed the parties' sentencing briefs. Defense counsel moved for the court to place defendant on mental health diversion pursuant to section 1001.36. The court denied the motion and agreed with the prosecutor that defendant was unsuitable because of the risk of his future dangerousness.

The court found defendant was statutorily ineligible for probation. The court denied defendant's request to dismiss the prior strike convictions because the current

offenses were serious and violent felonies, and his background demonstrates "crimes of increasing severity and his conduct is fully inside the spirit of the Three Strikes Law."

The court found there were significant aggravating factors because the circumstances of the crimes involved a high degree of cruelty and viciousness; the victim was uniquely vulnerable because he lured her to a secluded location under false pretenses; he intimidated witnesses after the crime; he tried to suborn perjury and interfere with court process; he planned the crime by taking the gun from Veronica G.; he was on parole when he committed the crime; and "[h]e's already threatened to shoot the victim again should he ever get out."[16]  There were no mitigating factors.

The court acknowledged defense counsel's argument that it should impose either concurrent or stayed sentences for counts 1 and 3, premeditated attempted murder, and count 2, aggravated mayhem.  The court rejected this request and stated it intended to impose consecutive third strike terms of 25 years to life for counts 1, 2, and 3.  The court found that as to count 2, aggravated mayhem, "there was a specific intent to disable or disfigure, and that was found by the jury.  This is further confirmed by [defendant's] post-conviction jail call to the victim, quote, 'You got my life I got your livelihood.' "[17]

The court found a consecutive sentence was appropriate for count 3, attempted murder by drowning, because it was "a completely separate act.  There was an opportunity for reflection.  He dragged the victim to the canal."

The court imposed the aggregate third strike sentence of a determinate term of 51 years plus an indeterminate term of 150 years to life, as follows:

---

[16] The court's statement is apparently based on the prosecution's sentencing statement and supporting exhibit of defendant's postverdict jail call with his mother, when he said that he shot Amber and would shoot her again if he was released. Defendant objected to the court's consideration of his postverdict statements.  The court did not expressly address this objection, but its reliance on his statements infers that it overruled the objection.

[17] The court again relied on defendant's postverdict statements, indicating an implied overruling of defendant's objection to this evidence.

Count 1, "the attempted murder for shots," 25 years to life, plus consecutive terms of 25 years to life for the section 12022.53, subdivision (d) firearm enhancement, and two five-year terms for two prior serious felony enhancements.

Count 2, aggravated mayhem, a consecutive term of 25 years to life, plus consecutive terms of 25 years to life for the section 12022.53, subdivision (d) firearm enhancement, and two five-year terms for two prior serious felony enhancements.

Count 3, "attempted murder by drowning," a consecutive term of 25 years to life, plus consecutive terms of five years for the section 12022.7, subdivision (e) enhancement, and two five-year terms for the prior serious felony enhancements.

Count 5, felony evasion, the consecutive upper term of three years doubled to six years (§ 667, subd. (e)(2)(6)); and

Count 6, dissuading a witness, a consecutive term of 25 years to life, plus two five-year terms for two prior serious felony enhancements.

The court stayed the sentence and enhancements imposed for count 4, kidnapping, pursuant to section 654, because it was encompassed in count 3, the second attempted murder conviction.

The court terminated the criminal protective order issued on June 18, 2018, and served defendant with another criminal protective order pursuant to section 136.2, prohibiting contact with the victim for 10 years.

The court stated the parties stipulated to victim restitution of $750,000 to Amber J. pursuant to section 1202.4, subdivision (f) in exchange for dismissal of an unrelated case. [18] The court ordered all other fines and fees stayed.

Also, on February 20, 2019, defendant filed a notice of appeal.

---

[18] In the reporter's transcript, the court first stated the stipulated amount of victim restitution was $750,000, then erroneously restated the amount as $753,000. The minute order and abstract of judgment confirm the amount was $750,000.

## DISCUSSION

## I.  Defendant's Convictions for Attempted Murder

Defendant was convicted of two separate counts of the premeditated attempted murder of Amber J.  The amended information alleged that count 1 was based on "shooting her in the face & arm with a handgun," and count 3 was based on "dragging her into a canal & leaving her to drown."  The jury was similarly instructed.

Defendant contends he was improperly convicted of two counts of attempted murder because his acts of shooting her and pushing her into the canal were incidental to each other, and were not separate, individual, completed crimes.  Defendant asserts his conviction in count 3 must be stricken pursuant to section 954 and *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*).

### A.  *Section 954*

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct.  'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citation.]'  [Citation.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227, italics added in original; *People v. White* (2017) 2 Cal.5th 349, 354; *People v. Correa* (2012) 54 Cal.4th 331, 336–337.)  Under section 954, a separate conviction is permissible for each completed crime, as determined by the statutory elements of the crime, even if the defendant had the same intent and objective in committing the multiple crimes and even if the defendant committed the crimes at or near the same time.  (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474–1477 (*Johnson*).)[19]

---

[19] Section 954 concerns the propriety of multiple convictions, not multiple punishments, which are governed by section 654.  (*People v. Gonzalez* (2014) 60 Cal.4th 533, 537.)  In issue II, *post*, we address defendant's alternate contention that he should not have received consecutive sentences for the two attempted murder convictions under section 654.

The question of whether multiple convictions are proper is reviewed de novo, "as it turns on the interpretation of section 954." (*People v. Villegas* (2012) 205 Cal.App.4th 642, 646.)

"[D]espite the seemingly absolute language of section 954," there are judicially created exceptions to the general rule permitting multiple convictions. (*People v. Ortega* (1998) 19 Cal.4th 686, 692, disapproved on other grounds in *People v. Reed, supra,* 38 Cal.4th 1224, 1228–1229; *People v. Sanders* (2012) 55 Cal.4th 731, 736.) For example, multiple convictions may not be based on necessarily included offenses, and "[w]hen a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed. [Citations.]" (*People v. Sanders, supra*, 55 Cal.4th at p. 736.)

As a separate matter, while section 954 "authorizes multiple convictions for different or distinct offenses," it does not "permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.' [Citation.]" (*People v. Vidana* (2016) 1 Cal.5th 632, 650 (*Vidana*).)

*Vidana* held the defendant in that case could not be convicted of both larceny (§ 484, subd. (a)) and embezzlement (§ 503) for the same conduct, even though the offenses had different elements and were not lesser included offenses. (*Vidana, supra*, 1 Cal.5th at p. 650.) *Vidana* held that while larceny and embezzlement had different elements and were defined in separate statutes, the Legislature had expressly stated in section 490a "that '[w]herever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word "theft" were substituted therefor.' [Citation.] [T]he obvious intent of this statute – enacted at the same time section 484 [larceny] was amended to include embezzlement – was to create a single crime of theft. In deciding whether larceny and embezzlement are different offenses, our focus is on the Legislature's intent.

'[I]f the Legislature meant to define only one offense' in amending section 484 in 1927, 'we may not turn it into two.' [Citation.]" (*Vidana, supra*, 1 Cal.5th at p. 648.)

Neither the lesser included offense exception nor the circumstances addressed in *Vidana* exist in this case.

### B.     *Bailey*

Defendant relies on *Bailey* and a series of cases that followed it in support of his argument that he could not be convicted of two separate counts of attempted murder because the crime constituted a single act.

In *Bailey*, *supra*, 55 Cal.2d 514, the defendant fraudulently applied for and received multiple welfare payments from a county agency. She was convicted of one count of grand theft and moved for a new trial. The trial court granted the motion, and the People filed an appeal from that order. (*Id*. at pp. 515–518.) *Bailey* addressed the issue of whether the defendant was guilty of one count of grand theft or a series of petty thefts. (*Id*. at p. 518.) *Bailey* created an exception to section 954's general rule and upheld the single conviction and concluded a series of separate thefts from the same victim could, in certain circumstances, be aggregated into a single count of grand theft. *Bailey* held the relevant test was whether there was "only one intention, one general impulse, and one plan," and concluded defendant was properly convicted of a single count. (*Id.* at pp. 519–520.)

### C.     *Interpretations of Bailey*

"Subsequent decisions have construed *Bailey* as being a two-sided coin, granting criminal defendants the right to insist upon the dismissal of all but one conviction when multiple crimes are unified by a single intent, impulse or plan. [Citation.] [¶] The courts have since struggled with the contours of this 'converse *Bailey*' doctrine. The decisions applying this doctrine have cited a variety of rationales, but its applicability ultimately turns on the nature of the underlying crimes at issue. These crimes – and the rule

governing them – fall into two categories." (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1517.)

"The first category pertains to crimes that treat harm or damage as one of their elements, and which permit the prosecution to aggregate that harm or damage. The most common crimes falling into this category are theft and vandalism. Until recently, the converse *Bailey* doctrine applied with full force to this category of offenses, and entitled a defendant to dismissal of all but one conviction for multiple crimes, even if each involved a complete criminal act, as long as the crimes were committed 'pursuant to a single general impulse, intention or plan.' [Citations.] This is no longer the case" after the ruling in *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*). (*People v. Kirvin, supra,* 231 Cal.App.4th at pp. 1517–1518.)

In *Whitmer*, the defendant was a manager of a motorcycle dealership and was convicted of 20 counts of grand theft based on 20 separate fraudulent transactions. (*Whitmer, supra*, 59 Cal.4th at pp. 734–735.) *Whitmer* explained *Bailey* only concerned a single fraudulent act followed by a series of payments, it had been interpreted "more broadly than is warranted," and rejected cases which relied on *Bailey*. (*Whitmer,* at pp. 735, 740.) *Whitmer* concluded that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) *Whitmer* affirmed the defendant's multiple convictions for grand theft, even though the acts were part of a single plan, because he committed a series of separate and distinct fraudulent acts, and each act had a separate intent to defraud. (*Id.* at pp. 740–741.) "[A] serial thief should not receive a ' "felony discount" ' if the thefts *are separate and distinct even if they are similar*." (*Id.* at pp. 740–741, italics added.) *Whitmer* declined to apply its ruling retroactively, and explained it only applied prospectively because of the long history of *Bailey's* application. (*Whitmer,* at p. 742.)

32.

The second category of cases that have interpreted *Bailey* "includes all of the other crimes that do not monetize and aggregate harm or damage. By and large, the converse *Bailey* doctrine has not been applied to this category of offenses; as a result, a defendant may be convicted of multiple crimes – even if the crimes are part of the same impulse, intention or plan – as long as each conviction reflects a completed criminal act. This is the rule that has been applied to convictions for insurance fraud [citation]; Medi-Cal fraud [citation]; forgery [citations]; burglary [citations]; sex crimes [citation]; corporal injury on a spouse [citation]; and identity theft [citation]. For a brief time, a handful of California courts prohibited multiple convictions for a series of related criminal acts unless they were separated by an interlude in which the defendant had a ' "reasonable opportunity to reflect upon his conduct" ' [citation] but our Supreme Court ultimately rejected that view [citations]." (*People v. Kirvin, supra*, 231 Cal.App.4th at pp. 1518–1519.)

"The California courts have, at times, offered reasons for confining the converse *Bailey* to harm-focused crimes. Expanding the doctrine further would exacerbate two of its undesirable side effects: The doctrine effectively grants wrongdoers a 'felony discount' by assuring them only one conviction for a potentially limitless number of related offenses [citation], and it effectively displaces the legislative definitions of what constitutes a completed crime with a new constellation of judicially created 'continuous crimes' that come into being should all related burglaries, sex crimes or identity thefts be aggregated into a single 'continuous crime' [citation]. Further, a chief benefit of the converse *Bailey* doctrine – making sure defendants who engage in conduct that technically constitutes two crimes but practically constitutes one (such as two immediately successive entries into the same home being treated as separate burglaries) – can be just as effectively achieved by the already existing rule prohibiting double

33.

*punishment,* and without all of the attendant disadvantages of prohibiting multiple convictions." (*People v. Kirvin, supra*, 231 Cal.App.4th at p. 1519.)[20]

In *Johnson, supra,* 150 Cal.App.4th 1467, the court held the defendant may be properly charged and convicted of multiple counts of spousal abuse under section 273.5, based on acts occurring during a single event, if the victim suffered multiple injuries caused by distinct applications of force. *Johnson* held the "crime described by section 273.5 is complete upon the willful and direct application of physical force upon the victim, resulting in a wound or injury. It follows that where multiple applications of physical force result in separate injuries, the perpetrator has completed multiple violations of section 273.5." (*Id.* at p. 1477.) *Johnson* explained why it was affirming three separate convictions for violating section 273.5, each of which concerned separate injuries sustained during the same beating on the victim, Jane Doe:

> "Defendant indisputably committed successive acts of violence against Doe [during the same beating incident]. Although Doe's testimony does not precisely describe the sequence of the beating, we do know that defendant beat her about the face and head; held her by her throat up against the wall; beat her on her back, hips, and legs; and stabbed her in the upper arm. Doe suffered two black eyes, a split lip, bruises to her neck, back, and hips and a puncture wound to her upper arm. From this evidence the jury could have concluded that defendant completed one violation of section 273.5 when he beat Doe about the head and face, blackening her eyes and splitting her lip; another when he held her by the throat and continued to strike her and restrain her such that she suffered bruises about her back and neck; and another when he injured her upper arm, drawing blood and leaving a visible scar. Accordingly, the evidence is sufficient to support the three convictions of section 273.5." (*Johnson*, at p. 1477.)

### D.    *Attempted Murder*

With these principles in mind, we turn to the question of whether multiple convictions of attempted murder were permitted under section 954.

---

[20] As we will discuss in issue II, *post*, "time to reflect" is still part of the section 654 multiple punishment analysis. (*People v. Jones* (2021) 65 Cal.App.5th 1, 12.)

Attempted murder is an assaultive crime against the person. (*People v. Miller* (1990) 50 Cal.3d 954, 987.) It thus falls within the second category of cases that "includes all of the other crimes that do not monetize and aggregate harm or damage," where *Bailey*'s rule has not been applied, so that "a defendant may be convicted of multiple crimes – even if the crimes are part of the same impulse, intention or plan – as long as each conviction reflects a completed criminal act." (*People v. Kirvin, supra*, 231 Cal.App.4th at p. 1518.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 739.) "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' [Citation.]" (*Ibid.*) The crime of attempted murder is not divided into degrees, and a finding of willful, deliberate, and premeditated attempted murder is necessary only for purposes of sentence enhancement. (*Id.* at p. 740.)

The "intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. *Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions*. [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 741, italics added.)

### E. *Analysis*

Defendant was properly convicted of two separate charges of attempted murder based on the unique facts of this case. As to count 1, attempted murder by shooting Amber J. in the face, "[the] act of purposefully firing a lethal weapon at another human

being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*Smith, supra*, 37 Cal.4th at p. 742.) The fact that "the bullet misses its mark or fails to prove lethal" is not dispositive because "the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill. [Citation.]" (*Ibid.*)

Defendant clearly planned to murder Amber J. in the orchard. Veronica G. testified that she had hidden her new gun in her bedroom. Defendant took it from her house at some point prior to picking up Amber. He arranged to pick up Amber early in the morning, drove her to the orchard, and they used drugs and engaged in sexual relations. He suggested that she walk around to the driver's seat so they could continue to engage in sexual relations. When she reached the driver's door, he leaned back into the car, obtained the gun, and then turned and shot her in the face. After she fell to the ground, he shot her a second time in the hand and shoulder. Defendant completed the first charged offense of attempted murder after he shot her.

Defendant committed a second act of attempted murder after he realized that Amber J. was still alive even though he shot her. He dragged her to the canal, kicked her wounded shoulder with such force that he left a shoe print on her back and she had trouble breathing; she fell into the swift moving water. He got back into his car and drove away, knowing she could not swim, and leaving her in an extremely secluded spot – at the bottom of a canal bank inside an orchard in a rural area. These acts constituted a separate offense of attempted murder, apart and after completion of the first act, since he knew that Amber could not swim. (See, e.g., *People v. Bohana* (2000) 84 Cal.App.4th 360, 369 [defendant's act of throwing into swimming pool an injured victim, who could not swim and was afraid of water, and had head injuries and was intoxicated, supported conviction for second degree murder, and also would have supported a first degree murder conviction].)

Defendant's convictions are inapposite from the conclusion reached in *People v. Coyle* (2009) 178 Cal.App.4th 209, where the defendant fired one shot that killed the victim once while trying to take drugs from him.  The defendant was convicted and sentenced for three counts of murder:  (1) murder with the special circumstance of being committed during the commission or attempted commission of a burglary; (2) murder with the special circumstance of being committed during the commission or attempted commission of a robbery; and (3) second degree murder.  (*Id.* at pp. 211, 213–214.)  On appeal, the defendant argued he was improperly convicted of three separate counts of murder; the People conceded that he could only be convicted of one count under section 954, because "[t]he three counts simply alleged alternative theories of the offense."  (*Id.* at p. 217.)

Under section 954, defendant in this case was properly convicted of two separate counts of premeditated attempted murder counts based on two separate acts.  "[T]he proper analysis involves a determination of when the charged crime is completed."  (*Johnson, supra*, 150 Cal.App.4th at p. 1474.)  Defendant's first act of attempted murder, by shooting Amber J. in the face at close range, was completed and distinct from his second attempted murder by kicking and pushing her down the embankment and into the canal, knowing that she could not swim.  Since each count alleged different acts, he was properly convicted in separate counts.  *The fact that defendant may have had the same intent and objective during both acts does not bar the multiple convictions.*  (*Id.* at pp. 1473–1477.)

## II.     The Sentences Imposed for the Attempted Murder Convictions

In the alternative to his argument in issue I, *ante*, defendant asserts that even if he was properly convicted of two counts of attempted murder, the court improperly imposed consecutive sentences for the two convictions.  Defendant argues the separate term of 25 years to life for count 3 should have been stayed under section 654 because the offenses

were part of a single scheme and course of conduct, and committed against the same victim, with the same intent and objective.

## A. *Section 654*

"Section 954 generally permits multiple conviction.  Section 654 is its counterpart concerning punishment.  It prohibits multiple punishment for the same 'act or omission.'  When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited.  [Citations.]" (*People v. Reed, supra*, 38 Cal.4th at p. 1227; *People v. Gonzalez, supra*, 60 Cal.4th at p. 537.)

"Section 654, subdivision (a) provides that '[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.'  ' " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " '  [Citation.]  Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense.  [Citations.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 353–354.)

"Under section 654, 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.  [Citations.]'  [Citations.]  This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.  [Citation.]" (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

In *People v. Trotter* (1992) 7 Cal.App.4th 363 (*Trotter*), the defendant stole a taxi from a cab driver at the airport and drove away.  Officer Bledsoe, who was on patrol by himself in a marked vehicle, saw the defendant driving the taxi and followed him on the freeway.  "Defendant drove recklessly and twice pointed his weapon in Bledsoe's direction.  After Bledsoe turned on his overhead lights, defendant fired a shot at Bledsoe's vehicle which fragmented the back window of the taxi.  Approximately a minute later, defendant fired another shot at Bledsoe's vehicle which blew out a portion of the taxi's rear window.  Seconds later, a third shot obliterated the entire window.  Bledsoe's vehicle was from 30 to 50 yards behind the taxi, with no vehicles in between, when the shots were fired."  (*Id*. at p. 366.)  The defendant drove off the freeway, hit a center divider, ran away from the stolen taxi, and was shot by a pursuing officer.  (*Id*. at p. 366.)  The defendant was convicted of three counts of assault on a peace officer with a firearm.  The trial court imposed consecutive sentences for the first two assault convictions and stayed the sentence for the third conviction.  On appeal, the defendant argued he should have only been sentenced on one assault conviction, and the other sentences should have been stayed under section 654 because the assault offenses were part of a single course of conduct and incidental to one objective.  (*Trotter,* at pp. 365, 366.)

*Trotter* affirmed imposition of consecutive sentences for the first and second assaults and held section 654 did not apply because the defendant's conduct "became more egregious with each successive shot.  Each shot posed a separate and distinct risk to [Officer] Bledsoe and nearby freeway drivers.  To find section 654 applicable to these facts would violate the very purpose for the statute's existence."  (*Trotter, supra*, 7 Cal.App.4th at p. 368.)

> "[T]his was not a case where only one volitional act gave rise to multiple offenses.  Each shot required a separate trigger pull.  All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable.

'Defendant should … not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his … assaultive behavior.' [Citation.] [¶] Defendant, as he was driving, turned back, pointed, and shot his weapon. He resumed driving, paused for about a minute, turned back, and shot again. After another few seconds a third shot was fired. There was thus time prior to each shot for defendant to reflect and consider his next action. As the court remarked at sentencing, 'they were separate acts of violence on different occasions coming down the freeway and putting different people – putting different officers in danger.' [¶] Section 654 is applicable when there is a single 'act.' But here, there were three separate acts, not one 'made punishable in different ways by different provisions of [the Penal Code].…' [Citations.]" (*Ibid*.)

In a footnote, *Trotter* speculated about a hypothetical case, that if "a defendant slashed his victim with a knife causing him to fall down, then paused, took out a gun and fired a fatal shot, no one could seriously dispute the fact each could be punished separately. If we change these facts, however, so that defendant, after pausing, plunges the knife into his victim, logic dictates the result should be the same. But, if the nature of the offense or the means of its perpetration were dispositive, defendant could not be punished separately in the latter scenario. [¶] Of course, the intent and objective test is controlling, and if defendant intended to kill with each assault it could be argued multiple punishment would be precluded. But even so, *when defendant pauses and, having the option to land another blow or to break off the attack, chooses the former course of action, his culpability increases and his intent, though the same in kind, can be considered separate and distinct …*." (*Trotter, supra*, 7 Cal.App.4th at p. 369, fn. 4, italics added.)

**B.** *Analysis*

The court did not violate section 654 when it imposed consecutive sentences for the two counts of attempted murder. The record supports the court's factual findings that count 3, attempted murder by drowning, was "a completely separate act" from count 1,

attempted murder by shooting Amber J. in the face, because "[t]here was an opportunity for reflection. He dragged the victim to the canal." As in *Trotter*, there were two acts that were sufficiently separate in time to afford defendant the opportunity to reflect. Defendant obviously paused after he shot Amber, and realizing she was still alive, had time to reflect on what to do. Instead of calling for help or just leaving her in the orchard and driving away, he performed an entirely different and separate act of dragging her to the canal and kicking her down the embankment, knowing that she could not swim.

## III. Consecutive Sentences for Attempted Murder and Aggravated Mayhem

Defendant argues the court improperly imposed consecutive sentences for count 1, attempted murder by shooting Amber J., and count 2, aggravated mayhem, and asserts the term for count 2 should have been stayed under section 654 because the acts underlying counts 1 and 2 – shooting her in the face – were identical.

### A. *Simple and Aggravated Mayhem*

Section 203 defines the offense of simple mayhem: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." Simple mayhem is punishable by two, four, or eight years in prison. (§ 204.)

Section 205 defines aggravated mayhem: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." Aggravated mayhem is punishable by a life sentence with the possibility of parole. (§ 205.)

"[B]oth sections 203 and 205 require that the disfiguring injury be permanent; such requirement was grafted to section 203 by case law and incorporated into section 205 by the Legislature." (*People v. Newby* (2008) 167 Cal.App.4th 1341, 1347.) "The

41.

modern rationale behind the offense of mayhem in California is ' " 'the preservation of the natural completeness and normal appearance of the human face and body.' " ' [Citation.] A member of the body is a general term describing any integral part or vital organ of the body. [Citation.] [¶] Disfigurement of the body ' "impairs or injures the beauty, symmetry or appearance of a person or thing … [or] renders unsightly, misshapen or imperfect or deforms in some manner." ' [Citation.] To prove mayhem based on a disfiguring injury, the injury must be permanent. [Citations.] Permanent scarring constitutes a disfiguring injury. [Citation.] An injury within the meaning of mayhem is still considered permanent if modern technology effectively repairs the injury. [Citation.] Accordingly, 'the possibility of medical alleviation [does] not … diminish one's culpability for infliction of an injury that would otherwise constitute mayhem.' [Citation.]" (*People v. Romero* (2019) 44 Cal.App.5th 381, 386–387; *People v. Chavez* (2021) 69 Cal.App.5th 159.)

"[T]he difference between simple mayhem and aggravated mayhem … is the requisite criminal intent." (*People v. Newby*, *supra*, 167 Cal.App.4th at p. 1347.) " 'Mayhem is a general intent crime. [Citation.]' " (*Ibid.*)

In contrast, "[a]ggravated mayhem requires the specific intent to cause the maiming injury. [Citations.] 'Evidence that shows no more than an "indiscriminate attack" is insufficient to prove the required specific intent.' [Citations.] "Furthermore, specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately." ' [Citation.]" (*People v. Assad* (2010) 189 Cal.App.4th 187, 195.) "[S]pecific intent may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors. [Citations.]" (*People v. Lee* (1990) 220 Cal.App.3d 320, 325.) An attack that was "directed, controlled, and of focused or limited

scope" may be sufficient to establish the defendant's specific intent to disable the victim. (*Id*. at p. 326.)

**B.**     ***Closing Argument and the Sentencing Hearing***

In closing argument, as to count 2, aggravated mayhem, the prosecutor stated it was "pieced together" with count 1, attempted murder, based on defendant's act of shooting Amber J.  Defendant "attempted murder by means of aggravated mayhem" because he shot her in the face and arm.  "And when you shoot someone in the face, you intend to disfigure that person.  When you shoot someone in the arm, the arm that she uses to tattoo, you intend to disable that person, and in this case, he did, in fact, permanently disfigure her.  She has a scar that still be seen today.  She has a disability in her nose and arm, still present today.  And even if you believe that that scar was sufficiently repaired to not be disfiguring, the law says that if there are medical procedures to repair this disfigurement, that counts for aggravated mayhem.  He has to [have] extreme indifference when he acts, physical and psychological well-being of another person.  If you don't believe he showed indifference to Amber [J.] when he did that to her, acquit him, go ahead, but he did, and everyone in the courtroom knows that."

The jury was instructed as to count 2, that aggravated mayhem required specific intent, and with simple mayhem as a lesser included offense.  Defendant was convicted as charged of aggravated mayhem.

**C.**     ***Analysis***

As set forth above, " ' "The proscription against double punishment in section 654 is applicable where there is a course of conduct which … comprises an indivisible transaction punishable under more than one statute ….  The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." [Citation.]  "The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a

43.

finding the defendant formed a separate intent and objective for each offense for which he was sentenced." ' [Citations.]" (*People v. Assad, supra,* 189 Cal.App.4th at p. 200.)

At the sentencing hearing, the court imposed consecutive sentences for count 1, attempted murder by shooting Amber J., and count 2, aggravated mayhem, and found that as to aggravated mayhem, "there was a specific intent to disable or disfigure, and that was found by the jury. This is further confirmed by [defendant's] postconviction jail call to the victim, quote, 'You got my life I got your livelihood.' "

We first note that defendant objected to the sentencing court's consideration of his postverdict statements that were recorded during his jail calls, but never challenged the authenticity of the recordings. The trial court did not expressly rule upon defendant's objection, but apparently overruled it by citing to defendant's postverdict statements when it imposed consecutive sentences. On appeal, defendant has not renewed his challenge to the sentencing court's reliance on his postverdict statements.

Even if the court should have excluded defendant's postverdict statements, however, the court did not violate section 654 by imposing consecutive sentences. Both attempted murder and aggravated mayhem are specific intent crimes. As the jury was instructed, attempted murder required the specific intent to kill the victim, and aggravated mayhem required the specific intent to permanently disable or disfigure the victim or deprive the victim of a limb, organ or member of his or her own body. The two specific intents are separate and distinct, as the specific intent for aggravated mayhem does not require an intent to kill. In convicting defendant of both attempted murder based on the shooting, and aggravated mayhem, the jury necessarily found he possessed these separate specific intents. "[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual *if the attempt to kill is unsuccessful*." (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 833–834, italics added.) Based on the evidence that defendant shot Amber J. in the face and then directly into her dominant hand, the court's finding that he

44.

had multiple criminal objections, both to disfigure Amber and try to kill her, is supported by the record.

There are cases that have held that section 654 prohibits multiple sentences imposed for both mayhem and an assaultive offense, but those holdings are inapposite to the instant case because they involved convictions for simple mayhem, a general intent crime, and not the specific intent finding required for aggravated mayhem. (See, e.g., *People v. Rodriguez* (2021) 66 Cal.App.5th 749, 756, fn. 3; *People v. Bui* (2011) 192 Cal.App.4th 1002, 1015; *People v. Sekona* (1994) 27 Cal.App.4th 443, 448; *People v. Pitts* (1990) 223 Cal.App.3d 1547, 1560.)

We also note that a contrary result was reached in *People v. Diaz* (2002) 95 Cal.App.4th 695, where the defendant confronted a member of a rival gang on the street and fired multiple gunshots at him. The victim was hit twice in the leg and suffered a disabling injury. The defendant was convicted of attempted murder, aggravated mayhem, and two assault counts. (*Id*. at p. 698.) The trial court sentenced the defendant for attempted murder and imposed concurrent sentences for the other three convictions and did not stay any of the terms. (*Id*. at p. 708.) On appeal, *Diaz* accepted, without analysis, the People's concession that the defendant could only be sentenced for attempted murder, and the other terms had to be stayed pursuant to section 654, because all the charges were "based on the same single act of shooting a single victim." (*Diaz*, at p. 708.)

In this case, however, defendant's shooting of Amber J. showed dual objectives – he took Amber by surprise and shot her directly in the face, and she fell to the ground. Defendant stood over her with the gun, and she realized he was going to fire again. She was lying on her back and bleeding from her facial wounds and raised her right hand to protect herself. Defendant could have aimed anywhere on her upper body, but instead he fired the second shot into her raised hand, and the bullet continued into her shoulder. The wounds made it hard for her to move her fingers in her dominant hand, and she was

45.

unable to continue working as a tattoo artist.  The court properly imposed consecutive sentences for counts 1 and 2.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, ACTING P. J.


MEEHAN, J.